[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14333

_____

D.C. Docket No. 1:16-cv-00760-CC

SUSAN MONAGHAN,

Plaintiff-Appellant,

versus

WORLDPAY US, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 2, 2020)

Before JORDAN and TJOFLAT, Circuit Judges, and HINKLE,* District Judge.

PER CURIAM:

      Susan Monaghan appeals from the district court's grant of summary

_____

* The Honorable Robert L. Hinkle, Senior United States District Judge for the Northern District
of Florida, sitting by designation.

judgment in favor of her former employer, Worldpay US, Inc., on her claim of retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a). Following a review of the record, and with the benefit of oral argument, we reverse and remand.

The district court applied our decision in *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012), and required Ms. Monaghan to show that the alleged retaliation was sufficiently pervasive to alter the conditions of her employment. But the proper standard in a retaliation case is the one set out by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006), and confirmed by this circuit in *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)—the retaliation is material if it "well might have dissuade[d] a reasonable worker from making or supporting a charge of discrimination."   Under this standard, a jury must decide Ms. Monaghan's retaliation claim.

# I

Viewed in the light most favorable to Ms. Monaghan, *see Bucklew v. Precythe*, 139 S.Ct. 1112, 1137 (2019), the facts relevant to the retaliatory harassment claim are relatively straightforward.[1]

Ms. Monaghan, who is white and over 40 years old, worked as an executive

---

[1] Ms. Monaghan's version of events is disputed, and we do not suggest that the facts summarized here set out what actually happened.  But at the summary judgment stage, it is Ms. Monaghan's version that counts.

assistant at Worldpay from September 2 to November 21 of 2014. Worldpay terminated Ms. Monaghan's employment during the 90-day probationary period applicable to new employees.

Tammi Daniel, who is black, was Ms. Monaghan's immediate supervisor from September 2 to November 3, when Ruth Hrubala (who is white and over 50 years of age) replaced Ms. Daniel. About a week after Ms. Monaghan began her tenure at Worldpay, Ms. Daniel made a number of race- and age-based comments to her. For example, Ms. Daniel told Ms. Monaghan that she needed a "suntan" to work in the executive suite, that she was "too old" to fit in at Worldpay, and that she was "over the hill." Ms. Daniel, referring to Ms. Monaghan, also told another employee that "this little white woman is giving me drama over here," and that Worldpay "did not need another older executive assistant around here." Ms. Monaghan says that she verbally reported Ms. Daniel's discriminatory comments to the Worldpay executives she supported, as well as to others, but not to anyone in human resources. According to Ms. Monaghan, the executives told her to avoid Ms. Daniel, or to stop reporting such conduct because Ms. Daniel was a black female and Worldpay did not want to get sued.

On October 2, Ms. Daniel called Ms. Monaghan into a meeting in a conference room and berated her for about 45 minutes regarding her complaints to the executives concerning the discriminatory remarks. Ms. Daniel was angry and

3

told Ms. Monaghan that she had "cut her own throat" by making the complaints. Ms. Daniel also instructed Ms. Monaghan not to have any contact with the executives she supported unless it was directly related to work on a specific task. Ms. Daniel did not stop there. She told Ms. Monaghan that she was "fucked," that she would be blackballed, that her days working for Worldpay were numbered, and that she "better watch it" because Ms. Daniel and her boyfriend knew where she lived. Ms. Daniel ended the meeting by pounding her fists on a table, leaning towards Mr. Monaghan, and saying: "I'm so pissed off at you, Susan Monaghan. How dare you make complaints about me." Ms. Monaghan contends that she told some of the executives about Ms. Daniel's behavior at this meeting, but they again refused to consider her complaints.

About two weeks later, around October 20, Ms. Daniel told Ms. Monaghan that she was training another person "to take your job. You better watch it, white girl." Ms. Monaghan again complained to an executive that Ms. Daniel was making racist remarks, but once again the complaint fell on deaf ears.[2]

In late October, while Ms. Monaghan was eating a banana sandwich for lunch, Ms. Daniel asked her how old she was. Ms. Daniel remarked that the only person she knew who ate that type of sandwich was her own mother.

At an offsite meeting on October 29, Ms. Daniel told Ms. Monaghan that she

---

[2] Around this time, another Worldpay employee heard April Watkins, the human resources director, tell Ms. Daniel that she needed to find a way to make Ms. Monaghan "disappear."

would be resigning.   A human resources executive, who was listening to the conversation, asked Ms. Daniel if she had plenty of "give a damn" money.   Ms. Daniel asked Ms. Monaghan if she knew that that meant, and when Ms. Monaghan said no, Ms. Daniel said "you white girls kill me."   Ms. Daniel also told Ms. Monaghan that she needed to "watch herself."   Ms. Monaghan reported these comments but was generally told to ignore Ms. Daniel because she was leaving the company.

In mid-November, Ms. Hrubala, who had taken over for Ms. Daniel, began to ignore Ms. Monaghan.  Worldpay terminated Ms. Monaghan's employment on November 20 and asserts that it did so due to "lack of confidence, lack of trust, and lack of teamwork."  But Ms. Monaghan says that Ms. Hrubala told her that she was being discharged for "complain[ing] and complain[ing]" to the executives, that they were tired of her "complaining," and that she did not "fit in with" Worldpay.[3]

Ms. Watkins told Ms. Monaghan "I need you to understand that today is for Tammi" as she was escorting her out of the building on the day of her termination. Ms. Monaghan understood that comment to mean that Worldpay was retaliating against her by firing her because Ms. Daniel had been discharged.

---

[3] Ms. Hrubula made the decision to fire Ms. Monaghan, but she consulted with Ms. Watkins and the executives whom Ms. Monaghan supported.   These executives were aware of Ms. Monaghan's complaints about Ms. Daniel.   Given the reasons Ms. Hrubula gave to Ms. Monaghan for her firing, a reasonable jury could find that Ms. Hrubula knew of Ms. Monaghan's complaints from the executives or others.

5

**II**

We review the district court's summary judgment order *de novo*. *See Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019). Before we begin our discussion, we explain what claim we are addressing.

Count II of Ms. Monaghan's complaint asserted a Title VII retaliation claim against Worldpay. *See* D.E. 1 at 9–10. Count III, a claim under 42 U.S.C. § 1981 for unlawful racial discrimination, mentioned retaliation in passing but only in a concluding paragraph alleging that Worldpay was liable for damages. *See id.* at 11. Count V, a claim for unlawful age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*, did not mention retaliation at all and did not cite to the Act's anti-retaliation provision, § 623(d). *See id.* at 12–13.

In her response to Worldpay's motion for summary judgment, however, Ms. Monaghan proceeded as though she had asserted retaliation claims under § 1981 and the ADEA as well as under Title VII. *See* D.E. 73 at 7. The magistrate judge apparently proceeded on this assumption as well. *See* D.E. 85 at 30–31. It is unclear whether the district court analyzed retaliation only under Title VII. *See* D.E. 91 at 5–6.

On appeal, Ms. Monaghan asserts (or at the very least suggests) that she pursued (and is pursuing) distinct retaliation claims under Title VII, § 1981, and

the ADEA.  But we need only address Ms. Monaghan's Title VII retaliation claim.
That was the only retaliation claim pled in the complaint, and "a plaintiff cannot
amend h[er] complaint through argument made in h[er] brief in opposition to the
defendant's motion for summary judgment."  *Miccousukee Tribe of Indians of Fla.
v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).[4]

## III

The term "retaliatory harassment" is not new to Title VII law, *see, e.g.,
Adams v. Reed*, 567 F.2d 1283, 1285 n.4 (5th Cir. 1978) (noting that the Title VII
defendant had not appealed district court's injunction prohibiting "retaliatory
harassment"), but its contours have not always been clear.  In *Wu v. Thomas*, 996
F.2d 271, 273–74 (11th Cir. 1993), we left open whether Title VII's anti-retaliation
provision, set out as part of 42 U.S.C. § 2000e-3(a), permits a claim for retaliatory
harassment which "caused the employee no tangible harm, such as loss of salary,
benefits, or position."  A couple of years later, we held that "Title VII's protection
against retaliatory discrimination extends to adverse actions which fall short of
ultimate employment decisions."  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d
1455, 1456 (11th Cir. 1998).  We concluded that, viewed collectively, the acts
complained of by the plaintiff—being improperly listed as a no-show for work,

---

[4] Ms. Monaghan does not appeal the grant of summary judgment on her discrimination claims and discusses her termination in the context of her retaliation claim.  Because all her arguments are focused on the retaliation claim, that is the only claim we address.

7

receiving reprimands and a suspension, and having a supervisor solicit co-workers for negative comments about the plaintiff, threaten to shoot the plaintiff in the head if she called headquarters to complain, and a delay in authorizing medical treatment for the plaintiff's allergic reaction—were "sufficient to constitute prohibited discrimination." *Id.*

## A

It has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality. Trivial slights are not actionable. *See, e.g.*, *Oncale v. Sundown Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (noting that Title VII is not a general civility code). Articulating the dividing line between substantial and trivial has not always been easy. But by now, apart from one outlier addressed later, the standards, if not always their proper application in any given case, are pretty well established.

First, some events are substantial enough standing alone to be actionable. These have sometimes been referred to as "tangible" or "adverse" employment actions. *See, e.g.*, *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("tangible employment action"); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018) ("adverse employment action"). The terms are interchangeable, at least as applied to this kind of discrimination claim. *See Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) ("Under our case

8

law, the definitions of tangible employment actions and adverse employment actions are essentially the same.").

Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001); *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005). A claim that an employee has suffered a tangible employment action based on race or other prohibited characteristics is sometimes referred to as a disparate-treatment claim. *See, e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Such a claim arises under 42 U.S.C. § 2000e-2(a)(1), which prohibits discrimination with respect to "compensation, terms, conditions, or privileges of employment."

Second, mistreatment based on race or other prohibited characteristics, including subjection to adverse conditions, is actionable even if the mistreatment does not rise to the level of a tangible employment action, but only if the mistreatment is "sufficiently severe or pervasive" that it can be said to alter the terms, conditions, or privileges of employment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*,

9

510 U.S. 17, 21 (1993)).  A claim based on this kind of mistreatment is often referred to as a hostile-environment claim.  When the mistreatment involves unwelcome sexual advances, the claim may be referred to alternatively as a sexual-harassment claim.  *See, e.g.*, *Cotton*, 434 F.3d at 1231 (noting that "sexual harassment" is actionable if it results in either a tangible employment action or a hostile environment); *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (noting that "sexual harassment" is actionable if it creates a "hostile or abusive environment").  Such a claim arises under the same Title VII provision as a disparate-treatment claim, 42 U.S.C. § 2000e-2(a)(1)—the provision that prohibits discrimination in compensation, terms, conditions, or privileges of employment.

Third, mistreatment based on retaliation for protected conduct—for example, making or supporting a charge of discrimination—is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). *Burlington Northern* recognized that this retaliation standard protects employees more broadly—and is more easily satisfied—than the standard applicable to claims of discrimination. *See id*. at 67.  Claims of this kind—retaliation claims—arise under

10

42 U.S.C. § 2000e-3(a). In contrast to the disparate-treatment provision, § 2000e-2(a)(1), the retaliation provision is not limited to discrimination with respect to compensation, terms, conditions, or privileges of employment.

In *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008), we recognized that *Burlington Northern* set out a different standard for retaliation claims. We said that under *Burlington Northern*, "in the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 974 (quoting *Burlington Northern*, 548 U.S. at 68). We applied the "well might have dissuaded" standard again in *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010).

Not surprisingly, every other circuit also has adopted this standard for retaliation claims after *Burlington Northern*. *See, e.g.*, *Billings v. Town of Grafton*, 515 F.3d 39, 52–53 (1st Cir. 2008); *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207–08 (2d Cir. 2006); *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011); *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 n.9 (5th Cir. 2008); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593–96 (6th Cir. 2007); *Szymanski v. Cty. of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006); *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 928–29 (8th Cir. 2007); *Campbell v. Haw. Dep't of*

*Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1083, 1086–87, 1090 (10th Cir. 2007); *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006).

**B**

That brings us to the outlier.  In *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012) (per curiam), four plaintiffs alleged they were subjected to a wide range of mistreatment at the hospital where they were employed.  Only two of the plaintiffs, both doctors, were involved in the appeal, and we discuss only their claims.

The doctors alleged they were mistreated in retaliation for complaining about discrimination and proceeded to trial.  The verdict form separately presented claims that the doctors suffered retaliatory mistreatment that rose to the level of tangible employment actions, on the one hand, and retaliatory mistreatment that constituted a hostile environment, on the other hand.  *See id*. at 1308.  The jury resolved the retaliatory-tangible-adverse-actions claim against the two doctors but resolved the retaliatory-hostile-environment claim in their favor.  *See id*.  The defendant appealed, asserting, among other things, that there was no such thing as a retaliatory-hostile-environment claim.  We had no trouble resolving that issue in the doctors' favor.  We acknowledged that our circuit had never so held but that every other circuit to address the issue had recognized such a claim.  *See id*. at 1311–12.

12

That left for decision whether the evidence was sufficient to support the verdict in the doctors' favor. We held that it was. Curiously, however, we began the discussion of this issue by setting out not the *Burlington Northern* standard, and not our unrestricted adoption of that standard in *Crawford*, but the standard applied in older cases. We said that to return a verdict for the doctors, the jury had to find the mistreatment at issue was "sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action." *Gowski*, 682 F.3d at 1312. This "terms and conditions" language came from the wrong statute—§ 2000e-2(a)(1) instead of § 2000e-3(a). And we said this even though we had just cited cases from other circuits recognizing retaliatory-hostile-environment claims—and cited those that applied the "severe or pervasive" standard as having been "abrogated on other grounds" by *Burlington Northern*. *See Gowski*, 682 F.3d at 1311 (citing three cases abrogated on other grounds by *Burlington Northern*, including, for example, *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (adopting the "severe or pervasive" standard for a retaliatory-hostile-environment claim)).

We agree with Ms. Monaghan, and with the EEOC as amicus curiae, that the articulation of the retaliation standard in *Gowski* is inconsistent with *Burlington Northern* and *Crawford*. Our adherence to the prior-panel rule is strict, but when there are conflicting prior panel decisions, the oldest one controls. *See, e.g.*, *Cohen*

13

*v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000).  We now reaffirm that the standard applicable to all Title VII retaliation claims is the *Burlington Northern* "well might have dissuaded" standard, precisely as our pre-*Gowski* opinion in *Crawford* said.

## C

The remaining question is whether the evidence, viewed in the light most favorable to Ms. Monaghan, satisfied *Burlington Northern*.  Understanding that the "well might have dissuaded" standard is contextual, *see Burlington Northern*, 548 U.S. at 69, we conclude that it did.

According to Ms. Monaghan, at the October 2 meeting Ms. Daniel told her that she had "cut her own throat," that she was "fucked," that she would be blackballed, and that her days at Worldpay were numbered.  Ms. Daniel also threatened Ms. Monaghan, telling her that she "better watch it" because Ms. Daniel and her boyfriend knew where she lived.  Ms. Daniel ended the meeting by pounding her fists on a table and saying to Ms. Monaghan "[h]ow dare you make complaints against me."  Around October 20, Ms. Daniel told Ms. Monaghan that she was training another person to "take your job," and again threatened her: "You better watch it, white girl."  These statements from a supervisor—which threatened both termination and possible physical harm—"well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See*

14

*Burlington Northern*, 548 U.S. at 70–72 (holding that a jury could reasonably find that reassignment to a less prestigious and more arduous position and a 37-day suspension without pay were—despite the receipt of backpay—materially adverse retaliatory actions).

In addition, Worldpay fired Ms. Monaghan.  Termination easily satisfies the "well might have dissuaded" standard, and a reasonable jury could find that the termination was retaliatory.  First, when Ms. Monaghan was terminated, Ms. Hrubala told her that she was being fired for "complain[ing] and complain[ing]."  As noted earlier, a jury could draw the inference that the reference to Ms. Monaghan's "complain[ing]" was to the complaints about Ms. Daniel.  Second, Ms. Watkins told Ms. Monaghan "I need you to understand this is for Tammy" when she escorted her out of the building.  This statement, by a Worldpay executive, is additional evidence supporting the inference that the termination was retaliation for Ms. Monaghan's complaints about Ms. Daniel.[5]

## IV

We reverse the district court's grant of summary judgment on Ms. Monaghan's Title VII retaliation claim and remand for a jury trial on that claim.

**REVERSED AND REMANDED.**

---

[5]In closing, we note that Ms. Daniel's conduct and the termination are alternative theories of retaliation.  So a jury could find for Ms. Monaghan based on Ms. Daniel's conduct even if it concludes that the termination was not retaliatory.

15

TJOFLAT, Circuit Judge, concurring in part, dissenting in part.

The District Court gave Worldpay US, Inc. summary judgment on Susan Monaghan's claims that Worldpay retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d).[1]  I concur in Court's decision to reverse the District Court's judgment and remand the case for further proceedings; for genuine issues of material fact remain to be litigated.  I write separately because I disagree with the Court that our rule barring the amendment of a complaint in a memorandum filed in opposition to a motion for summary judgment precludes us from considering the retaliation claims the District Court rejected.  True, Monaghan did amend her complaint—specifically Counts II, III and V—in her memorandum opposing Worldpay's motion, but the bar is inoperative here because Worldpay went along with the amendment, effectively consenting to it within the meaning of Federal Rule of Civil Procedure 15(a)(2).[2]  And the District Court did, too.  It granted Worldpay summary

---

[1] "Plaintiff generally maintains . . . that Defendant is liable for retaliation . . . under 42 U.S.C. § 1981, Title VII, and the ADEA."  The District Court made this statement in reviewing Monaghan's objections to the Magistrate Judge's Report and Recommendation ("R&R"), which recommended that the District Court grant Worldpay's motion for summary judgment on those retaliation claims.

[2] Rule 15(a)(2) provides that after the defendant has filed a responsive pleading, a complaint can be amended "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).

16

judgment on the retaliation claims Monaghan presented in her memorandum.  A

review of the way in which the case was litigated makes this clear.

I.

Susan Monaghan's complaint provided the background for this litigation,

nothing more.  The complaint contained five counts.  All were based on a set of

factual allegations that were common to all counts.[3]  The counts asserted the

following claims: Count I—"Race Discrimination in Violation of Title VII of the

Civil Rights Act of 1964," Count II—"Retaliation in Violation of Title VII of the

Civil Rights Act of 1964," Count III—"Violation of 42 U.S.C. § 1981,"  Count

IV—"Claims for Relief Under Civil Rights Act of 1991,"[4] and Count V——

---

[3] For convenience, and to put my remarks in context, I have made the complaint an appendix to this opinion.

[4] Although Count IV did not cite the United States Code for the relevant provision of the Act, I assume that Monaghan was referring to 42 U.S.C. § 1981(a), "Damages in cases of intentional discrimination in employment," which states, in pertinent part:

(a) Right of recovery
(1) Civil rights
In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act, and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.
. . . .
(b) Compensatory and punitive damages
(1) Determination of punitive damages
A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a

"Violations of the Age Discrimination in Employment Act, as Amended." Counts II through V incorporated by reference all of the complaint's factual allegations and each of the preceding counts, such that Count V was an amalgamation of all counts.[5]  To complicate matters further, the count-specific allegations were mere "legal conclusion[s] couched as . . . factual allegation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1950 (2009) (internal quotations omitted).[6]

---

discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
(2) Exclusions from compensatory damages
Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.

Count IV was not an independent claim.  Rather, if Monaghan prevailed on her Count III claim brought under 42 U.S.C. § 1981, she might be able to recover punitive damages under § 1981a(b).

[5] This is classic "shotgun" pleading.  *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320–23 (11th Cir. 2015) (explaining shotgun pleadings).  In responding to a multiple-count complaint like the one Monaghan filed, the defendant is unable to determine which factual allegations pertain to which count, and to the extent the counts are fused together, to determine the elements of the fused claim.  So, as here, the defendant, rather than undertaking such determinations, simply replies to the complaint in kind with a bevy of one-sentence affirmative defenses that apply indiscriminately to all counts.

[6] Due to its shotgun nature and conclusory allegations, Monaghan's complaint failed to comply with the requirements of Fed. R. Civ. P. 8(a), as interpreted by the Supreme Court in *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007), by "'stat[ing] a claim for relief that is plausible on its face.'" Had Worldpay moved the District Court to dismiss the complaint or to require a more definite statement, *see* Fed. R. Civ. P. 12(b)(6) and 12(e), the Court would have granted its motion.  But Worldpay did not move the Court to do that.  Although its first affirmative defense alleged that the complaint failed to state a claim for relief, the Magistrate Judge to whom the case was referred, and thus the District Court, could not consider the defense because Worldpay did not present it to the Court for disposition pursuant to a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings.

18

Worldpay replied to Monaghan's complaint in kind, filing an answer with sixteen affirmative defenses, all but one consisting of one sentence.[7] None of the defenses referenced a specific count; thus, all defenses applied to all counts. After the parties joined issue in this way, discovery ensued. When it concluded, Worldpay moved the District Court for a summary judgment on all of Monaghan's claims. The motion referred to her claims collectively: that "her employment was terminated on the basis of her age and race (Caucasian); that she was subjected to a hostile work environment on the basis of her age and race; and, that she was subjected to retaliation for allegedly reporting age and race discrimination."[8]

In her response memorandum ("Opposition Memorandum"), Monaghan stated that she was "not moving forward on her claims of a hostile work environment." Instead, she was moving forward on her claims of retaliation under "42 U.S.C. § 1981, Title VII and the ADEA." Monaghan was presenting two

---

[7] Several affirmative defenses—the second, third, fourth, fifth, seventh, eight, eleventh, fourteenth, and sixteenth—were nothing but bald conclusions that in the context of this case were incomprehensible. For example, the Complaint alleged that Worldpay "purports to provide a legitimate non-discriminatory reason for the adverse action, [but] this reason is . . . pre-textual." The Complaint didn't reveal the reason. Worldpay's answer alleged that it had "legitimate non-discriminatory reasons for its actions," but failed to reveal the reasons. The seventh affirmative defense alleged that "all actions . . . Worldpay [took] . . . were for legitimate, non-discriminatory and non-retaliatory business reasons and factors," but it once again failed to say what those reasons were. The sixteenth defense alleged that "Plaintiff's claims may be barred in whole or in part on the doctrines of laches, waiver, estoppel, or unclean hands," but failed to indicate the basis for the doctrines' applications.

[8] Worldpay's description of Monaghan's claims did not square with what the complaint alleged. The complaint contained no allegation that Monaghan's employment was "terminated on the basis of her age and race." Nor did it contain the words "hostile work environment."

19

claims of retaliation.  First, Worldpay retaliated against her for engaging in protected activity, for complaining of "Daniel's racist and ageist statements to the executives she worked for."  And second,  Daniel, and thus Worldpay, retaliated against her in two ways: (1) by telling her that "she 'cut her own throat,' was blackballed and 'f-ed' and her days 'were numbered because [she] was too old to 'fit in' the office," and (2) with "thinly veiled threats of bodily harm, telling [her repeatedly] 'to watch it' because her boyfriend knew where [she] lived [and] had money."

In its reply brief, Worldpay argued that any retaliation claim based on Daniel's conduct was not properly before the District Court because Monaghan had not presented it in her complaint (and had not obtained leave to amend it pursuant to Federal Rule of Civil Procedure 15(a)(2)).  According to Worldpay, "[t]he only retaliation claim alleged in the Complaint is based on the termination of Plaintiff's employment."

The Magistrate Judge to whom the case had been referred took Worldpay's motion for summary judgment under advisement.  In her Report and Recommendation ("R&R") on the motion, the Magistrate Judge explained Monaghan's two theories of retaliation as the Magistrate Judge understood them: Worldpay retaliated against Monaghan (1) when it terminated her employment because of her protected activity, and (2) when Daniel, in her supervisory capacity

20

over Monaghan, created a hostile work environment.[9]  The Magistrate Judge did

not address Worldpay's argument that the second retaliation theory was not

properly before the District Court.  Instead, the Magistrate Judge assumed that it

was.  She described Monaghan's second theory of retaliation (as explained in

Monaghan's Opposition Memorandum) as follows:

> In this case, Plaintiff asserts that during a period of approximately a
> month between Plaintiff's first purported complaints of discrimination
> and Daniel's discharge, Daniel retaliated against her by (1)
> threatening to terminate her employment; (2) issuing "thinly veiled
> threats of bodily harm" when Daniel said to "watch it" and said she
> and her boyfriend knew where Plaintiff lived; and (3) grooming
> O'Neal as Plaintiff's replacement.[10]

The Magistrate Judge conceptualized the second theory of retaliation as a

"retaliatory hostile work environment claim," citing our decision in *Gowski v.*

*Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012), as her authority.  To prevail on such

claim, the employee must establish that (1) she engaged in statutorily protected

activity, (2) after doing so, was subjected to harassment that was (3) caused by her

protected activity, and the harassment (4) was sufficiently severe or pervasive to

alter the terms of her employment.  The Magistrate Judge found that Daniel's

"threats to terminate" Monaghan's employment or "replace" her with O'Neal

---

[9] As the Magistrate Judge expressed it in her R&R to the District Court, "[i]n this case,
Plaintiff asserts that she was retaliated against for complaining about Daniel's alleged
discriminatory comments and/or conduct (1) when Daniel created a hostile work environment for
Plaintiff while Daniel was still employed by Worldpay and (2) when Plaintiff was discharged."

[10] This paraphrases what Monaghan stated in her Opposition Memorandum.

21

"d[id] not amount to a sufficiently material adverse action to constitute retaliation." Nor did Daniel's implied threats to her physical safety meet the threshold. The threats were not "'extremely serious' enough without a tangible employment action to amount to a material change in the terms and conditions of employment." Monaghan's retaliatory hostile work environment claim accordingly failed.

Turning to Monaghan's retaliatory termination claim, the Magistrate Judge acknowledged the existence in the record of evidence that Monaghan "was terminated for her purported complaints about race and/or age-based discrimination" and that such evidence amounted to "circumstantial evidence of improper retaliatory intent under Title VII and/or the ADEA." But that was not enough to make out a claim of retaliatory termination. Monaghan failed to introduce evidence that the decisionmaker, Ruth Hrubala, who had replaced Daniel as her supervisor on November 3, 2014, "knew about the substantive contents of [her] complaints." Worldpay had presented "uncontradicted evidence" that the decisionmaker was unaware that Monaghan had engaged in protected activity. The Magistrate Judge therefore found that Monaghan's retaliatory termination claim also failed.

Monaghan objected to the Magistrate Judge's R&R on several grounds, including those relevant to her claim that Worldpay terminated her employment because she complained of race and age discrimination and to her claim (presented

in her Opposition Memorandum) that Worldpay retaliated against her based on Daniel's conduct.[11]

Regarding the retaliatory termination claim, Monaghan took issue with the Magistrate Judge's position that Hrubala, as the decisionmaker, was unaware that Monaghan had engaged in protected activity. In Monaghan's mind, Hrubala was not the decisionmaker. All she did was make a "recommendation" to the HR department, which consulted with the ELTs, all of whom were aware of the complaints of discrimination Monaghan had made and determined whether Monaghan should be discharged.

Regarding the retaliation claim based on Daniel's conduct, Monaghan contended that the Magistrate Judge erroneously treated her claim as a "hostile work environment" claim under *Gowski* rather than a retaliation claim under *Burlington N. & Santa Fe Ry. Co. v. White*, and the standard it established: Whether the retaliatory conduct "could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006).

The District Court overruled Monaghan's objections to the Magistrate Judge' R&R and adopted the R&R as the opinion of the Court. Referring to the

---

[11] Worldpay made no objection to the R&R. It therefore waived its argument that the Magistrate Judge erred in considering the claim Monaghan asserted for the first time in her Opposition Memorandum.

23

Magistrate Judge's treatment of the claim presented in Monaghan's Opposition Memorandum—retaliation by Worldpay based on Daniel's conduct—the Court reframed the claim as a retaliatory *harassment* claim and rejected it. It did so because, as it read the record, Worldpay's conduct did not alter the terms or conditions of Monaghan's employment.

## II.

This is the way the case was litigated in the District Court. At the end of the day, the question for the District Court was pure and simple: whether the evidence adduced during discovery was sufficient to create a material issue of fact on claims of retaliation asserted under Title VII, 42 U.S.C. §1981, and the ADEA. Like the Magistrate Judge's R&R, the District Court's dispositive order is silent as to where in Monaghan's complaint these claims were alleged—other than to imply that the claims were presented in the counts brought under those three statutes. It was sufficient that Monaghan fleshed them out in her Opposition Memorandum. I submit that, on remand, the District Court's task is to treat this case as presenting claims of retaliation under Title VII, 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981,[12] and the ADEA, 29 U.S.C. § 623(d).

_____

[12] The substantive standard governing retaliation claims brought under Title VII and § 1981 is the same in this Circuit. *See Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events."). However, § 1981, by its statutory language, only applies to claims premised on racial discrimination. *See* 42 U.S.C. §

*          *          *

In this case, the plaintiff alleged claims under Title VII in Count II, under 42 U.S.C. § 1981 in Count III, and under the ADEA in Count V. Only one of the counts, Count II, contained a claim of retaliation; Monaghan was fired "because of protected activity." Count II said nothing about retaliation based on Daniel's conduct. Counts III and V alleged that Monaghan was subjected to "different terms and conditions of employment" due to race (Count III) and age (Count V), but said nothing about retaliation for engaging in protected activity.[13] What Monaghan did with her Opposition Memorandum was to insert facts discovery established into Counts II, III and V and thus create new claims of retaliation. Count II now included (in addition to the retaliatory discharge claim) a claim that Daniel, acting for Worldpay, retaliated against Monaghan because she had complained of her conduct. Count III then replicated Count II's dual claims of retaliation. Likewise Count V. These are the counts the District Court adjudicated. It did so, albeit tacitly, after augmenting Counts II, III and V with facts the parties' discovery disclosed and thus expanding the claims they asserted.

The tactic of filing a complaint consisting of claims pled like the claims here, with labels identifying the legal theories on which the claims were based and

1981(a) ("All persons within the jurisdiction of the United States shall have the same right[s] . . . as [are] enjoyed by white citizens").

[13] The word "retaliation" appeared in the final sentence of Count III as one of the conditions of employment, not as an act precipitated by protected complaints of discrimination.

25

conclusory statements to support them, are commonplace in the Eleventh Circuit, especially in employment discrimination cases. The tactic bears fruit when, as here, the defendant foregoes a motion to dismiss or for a more definite statement and, treating the complaint as legally sufficient,[14] responds to it in kind. The complaint's claims, though legally insufficient as pled, become sufficient after the defendant moves for summary judgment. At this point, the plaintiff buttresses her claims in a memorandum in opposition to the defendant's motion. In fact, the more nebulous and insufficient the complaint the greater the potential for presenting claims beyond the contours of its allegations. The memorandum is likely to be the defendant's first notice of what the plaintiff is actually contending. That was the situation here. But the defendant could hardly complain. After all, by foregoing a challenge to the complaint's sufficiency at the outset, the defendant practically invites the scenario that develops.

It goes without saying that the manner in which this case was litigated hardly comports with the litigation model the framers of the Federal Rules of Civil Procedure created. The complaint and answer the parties filed here should not have been permitted to go forward. The pleadings did little, if anything, more than to notify the District Court of a legal dispute in Worldpay's workplace. The

---

[14] In theory, the defendant treats the complaint as legally sufficient even though it asserts as an affirmative defense that the complaint fails to state a claim for relief. I say this because the defendant never presents the defense to the district court for adjudication in a motion for judgment on the pleadings.

26

District Court should have required the plaintiff to replead her complaint without waiting for the defendant to respond. As we stated in *Byrne v. Nezhat*, 261 F.3d 1075, 1133 (11th Cir. 2001), the "district court *must* intervene . . . and order a repleading . . . even if the defendant does not move for a more definite statement."[15]

---

[15] This is in keeping with the district court's "power and duty to define the issues at the earliest stage of litigation." *Johnson Enters. of Jacksonville v. FPL Grp., Inc.,* 162 F.3d 1290, 1333 (11th Cir. 1998). Congress has enforced a similar policy in cases in which "a prisoner seeks redress from a governmental entity" in a civil action brought in district court. 28 U.S.C. § 1915A. A district court "*shall* . . . dismiss the [prisoner's] complaint . . . , if the complaint . . . fails to state a claim upon which relief may be granted." *Id.* (emphasis added).

## APPENDIX

## COMPLAINT FOR DAMAGES

**COMES NOW**, Plaintiff Susan Monaghan ( "Plaintiff"), by and through the undersigned counsel, and files this, her Complaint for Damages, respectfully showing the Court as follows:

## JURISDICTION AND VENUE

1.

Plaintiff invokes the jurisdiction of this court pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1981, Civil Rights Act of 1991, and the Age Discrimination in Employment Act of 1967, as amended ("ADEA"). This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5(f), and 29 U.S.C. § 2617(2)(a).

2.

Defendant WorldPay US, Inc. ( "Defendant" or "WorldPay") does business in this judicial district. Additionally, the unlawful employment practices alleged in this Complaint were committed within this District.

## PARTIES

3.

Plaintiff is a citizen of the United States of America, and is subject to the jurisdiction of this Court.

4.

Defendant WorldPay US, Inc. ( "Defendant" or "WorldPay") is qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

5.

Defendant can be served through their Registered Agent of record, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, GA 30092.

## ADMINISTRATIVE PROCEDURES

6.

Plaintiff has fulfilled all conditions necessary to proceed with this cause of action under Title VII. Plaintiff filed a charge of discrimination with the EEOC on March 24, 2015; the EEOC issued its Notice of Right to Sue on February 17, 2016.

7.

Plaintiff timely files this action within ninety (90) days of receipt of the Notice of Right to Sue from the EEOC.

## FACTUAL ALLEGATIONS

8.

Defendant is now, and at all times relevant hereto, has been an employer engaged in an industry affecting commerce within the meaning of §701(b), (g) and (h) of Title VII and has employed more than the requisite number of persons for the requisite duration under Title VII.

9.

Defendant hired Plaintiff on or about September 2, 2014, as an Executive Assistant to the CIO, CTO, and SVP.

10.

Plaintiff's direct supervisor, Tammi Daniel, began to subject Plaintiff to race-based discrimination almost immediately after Plaintiff started working for Defendant.

11.

For example, Ms. Daniel told Plaintiff that she needed a "suntan" in order to sit in their office.

12.

Ms. Daniel's expressed to Plaintiff that she did not have the time to train her, but then allowed a temporary employee that began a week after Plaintiff to shadow her.

13.

Plaintiff complained to Bernie McGarrigle, CIO for Defendant, on or about September 9, 2014, about Ms. Daniel's race-based comment and resistance to help Plaintiff.

30

14.

Following Plaintiff's complaint to Mr. McGarrigle, Ms. Daniel continued to harass and threaten Plaintiff.

15.

For example, Ms. Daniel told Plaintiff that she was not a fit for the office because she had complained.

16.

Ms. Daniel also told Plaintiff that she was "too old" to fit in at the office.

17.

Ms. Daniel also forbade Plaintiff from speaking to any other ELT member about anything other than for a specific task Plaintiff was performing, thereby making it more difficult for Plaintiff to successfully do her job.

18.

Ms. Daniel also told Plaintiff that she was "blackballed" and asked if Plaintiff had "enough sense" to understand what that phrase meant.

19.

Ms. Daniel also told Plaintiff that Plaintiff's days working for Defendant were numbered.

20.

31

Ms. Daniel told Plaintiff that April Watkins, the Chief Human Resources Officer at the time, was her boss and close friend, so Plaintiff was f****d.

21.

Ms. Daniel also threatened Plaintiff, stating that she and her boyfriend knew where Plaintiff lived.

22.

On or about October 6, 2014, Plaintiff approached Mr. McGarrigle for a second time in an attempt to report the discrimination and harassment by Ms. Daniel.

23.

Plaintiff told Mr. McGarrigle that she had prepared an email that she wanted to send to him.

24.

Mr. McGarrigle's response was that if it was about Ms. Daniel, then he did not want to hear anything else, and to not send him an email that was "inappropriate."

25.

After Mr. McGarrigle refused to hear Plaintiff out, Plaintiff printed the complaint and asked Steve Karp, the SVP of Products, to look it at.

26.

After reading Plaintiff's complaint, Mr. Karp stated "don't send this to me. I don't want to know."

27.

Plaintiff expressed her frustration to Mr. Karp and told him that she had been threatened by Ms. Daniel, to which Mr. Karp replied "I don't want to hear it, it's too much."

28.

Approximately two weeks after Plaintiff's second complaint, Plaintiff was notified that Ms. Daniel would be leaving the company.

29.

The same week Plaintiff came home to find the glass in her front door shattered.

30.

Ms. Daniel was permitted to work for a few additional weeks in order to train her replacement, during which time she continued to torment Plaintiff.

31.

Instead of taking action to ensure that the harassment and discrimination of Plaintiff ceased, Defendant allowed Ms. Daniel to continue to target Plaintiff.

32.

In November 2014, Plaintiff's car was tampered with.

33.

On November 21, 2014, Plaintiff was terminated.

34.

Chief Human Resource Office April Watkins told Plaintiff that Plaintiff was being terminated because of her complaints of discrimination.

35.

Others outside the Plaintiff's protected class were treated differently.

36.

Although Defendant purports to provide a legitimate non-discriminatory reason for the adverse action, this reason is a pre-textual in nature.

37.

Defendant fired Plaintiff because of her protected activity, ie., complaining about being harassed and discriminated against on the basis of her race and age.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

38.

Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

39.

Defendant's actions in subjecting Plaintiff to different terms and conditions of employment constitutes unlawful discrimination and retaliation on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. and 42 U.S.C. section 1981A.

40.

Defendant has willfully and wantonly disregarded Plaintiff's rights, and its discrimination against Plaintiff was undertaken in bad faith.

41.

The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity, and has otherwise adversely affected her status as an employee because of her race.

42.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful discrimination

## COUNT II: RETALIATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

43.

Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

44.

Defendant's actions, as detailed above, in terminating Plaintiff because of her protected activity constitutes unlawful intentional retaluation in violation of Title VII.

45.

Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was untertaken in bad faith.

46.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful retaliation.

## CLAIM III: VIOLATION OF 42 U.S.C. § 1981

47.

Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

48.

Defendant's actions in subjecting Plaintiff to different terms and conditions of employment constitutes unlawful discrimination on the basis of race in violation of 42 U.S.C. section 1981.

49.

The effect of the conduct was to deprive Plaintiff of economic opportunites, and otherwise adversely effected Plaintiff's status as an employee, because of his race.

50.

As a direct and proximate result of these actions, Plaintiff has been made a victim of acts that adversely affected his psychological and physical well being.

51.

As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has been embarrassed, humiliated and has suffered damage to his emotional health, and has lost back pay and front pay.

52.

Defendant has willfully and wantonly disregarded Plaintiff's rights, and Defendant's discrimination against Plaintiff was undertaken in bad faith.

53.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful retaliation.

## COUNT IV: CLAIMS FOR RELIEF UNDER
## CIVIL RIGHTS ACT OF 1991

54.

Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

55.

Defendant discriminated against Plaintiff, and in failing and refusing to take any appropriate remedial action to remedy the unlawful employment practices has not only deprived Plaintiff of equal employment opportunities, but has exhibited malice or reckless indifference to the federally protected rights of Plaintiff.

56.

Plaintiff thus seeks compensatory and punitive damages pursuant to §102(a)(1) of the Civil Rights Act of 1991.

## COUNT V: VIOLATIONS OF THE AGE DISCRIMINATION
## IN EMPLOYMENT ACT, AS AMENDED

57.

Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

58.

Defendant's actions in subjecting Plaintiff to different terms and conditions of employment constitutes unlawful discrimination on the basis of her age in violation of ADEA, as amended.

59.

Defendant has willfully and wantonly disregarded Plaintiff's rights, and Defendant's discrimination against Plaintiff was undertaken in bad faith.

60.

The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity, and has otherwise adversely affected her status as an employee because of her age.

61.

As a direct and proximate result of Defendant's violation of the ADEA, Plaintiff has lost wages and benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

(a) General damages for mental and emotional suffering caused by Defendant's misconduct;

(b) Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(c) Special damages and/or liquidated damages for lost wages and benefits and prejudgment interest thereon;

(d) Reasonable attorney's fees and expenses of litigation;

(e) Trial by jury as to all issues;

(f) Prejudgment interest at the rate allowed by law;

(g) Declaratory relief to the effect that Defendant WorldPay, Inc. has violated Plaintiff's statutory rights;

(h) Injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendant WorldPay, Inc. from further unlawful conduct of the type described herein; and,

(i) All other relief to which Plaintiff may be entitled.

Respectfully submitted this 9th day of March, 2016.