[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10014

_____

D.C. Docket No. 8:16-cv-02419-CEH-AEP


ERIN TONKYRO,
DANA STRAUSER,
KARA MITCHELL-DAVIS,
YENNY HERNANDEZ,

Plaintiffs – Appellants,

versus

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant – Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 24, 2021)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal arises from a Title VII action filed by four ultrasound technologists at the James A. Haley VA Healthcare System ("Tampa VA") against the Secretary of the Department of Veterans Affairs ("the Secretary"). All Plaintiffs allege that their supervisors and coworkers retaliated against them and subjected them to a hostile work environment because they engaged in protected Equal Employment Opportunity Commission ("EEOC") activity. One Plaintiff also alleges that she was subjected to a hostile work environment based on her sex. Plaintiffs appeal from the District Court's grant of summary judgment in favor of the Secretary. We partially affirm and partially vacate the District Court's decision with instructions on remand.

I.

In 2012, Plaintiffs Erin Tonkyro, Kara Davis, and Dana Strauser filed EEOC complaints alleging that they were sexually harassed by supervisors and radiologists at the Tampa VA. Specifically, Plaintiffs alleged that they were harassed by John Bennett, Chief Radiology Technologist and Plaintiffs' second line supervisor[1]; Dr. Joseph Parise, Assistant Chief of Radiology; and that Jeri Graham, Plaintiffs' former direct supervisor and current second-line supervisor, aided and abetted the harassment. An Administrative Investigation Board (AIB)

---

[1] In 2013, Bennett became the Administrative Officer of Radiology and ceased supervising Plaintiffs. *See* Appendix.

was formed to investigate the complaints, and Plaintiff Yenny Hernandez testified in support of the other three Plaintiffs. The complaints were eventually settled with the VA in September 2013.

Under the terms of the Settlement Agreements, Plaintiffs waived all potential actions "which were raised or could have been raised" in the 2012 EEOC complaints, as well as "future causes of action against the [VA] based on such actions in existence" at the time of the settlements. Among other things, the Settlement Agreements required the VA to "conduct a fact finding based on the [sexual harassment] allegations," "issue a letter of instruction" to Bennett, Parise, and Graham "to refrain from making any allegedly defamatory or gender based stereotype derogatory remarks in the workplace regarding [Plaintiffs]," to expunge certain records from Plaintiffs' personnel files,[2] and to pay Plaintiffs a sum of damages. The Settlement Agreements also stated: "All promises, conduct and statements made in the course of the settlement session are confidential and will not be disclosed voluntarily to anyone except to those required in order to approve the terms of this Agreement or to carry out its terms, to the extent permitted by law."

---

[2] Paragraph 3.b of the Settlement Agreements required the VA "[t]o expunge from the Complainant's Official Personnel File the written counseling dated February 15, 2013." The "written counseling" referred to an incident in which Eubanks gave Davis and Strauser written warnings for being absent from the ultrasound duty station without permission.

In July 2014, Tonkyro, Davis, and Strauser filed formal EEOC complaints alleging retaliation for their previous EEOC complaints and 2013 settlements. Hernandez filed a formal EEOC complaint in September 2016 alleging sexual harassment and retaliation for her participation in the 2012 EEOC proceedings.

On August 23, 2016, Plaintiffs filed the present action against the Secretary. Plaintiffs alleged that their supervisors and coworkers retaliated against them because of their EEOC complaints and settlements, and created a hostile work environment in violation of 42 U.S.C. § 2000e *et seq.*.  Hernandez also alleged that she was subjected to a hostile work environment based on her sex.  We summarize these allegations below, first discussing the allegations common to all Plaintiffs, then the allegations relating to each particular Plaintiff.

A.

All Plaintiffs complain that they were denied opportunities for advancement, that management intentionally understaffed and mismanaged the radiology department, that private information relating to Plaintiffs' EEOC activity was published on a hard drive accessible to VA employees, and that VA employees spread rumors and made disparaging comments about Plaintiffs and their EEOC activity.  The details of these allegations are as follows.

Regarding opportunities for advancement, Plaintiffs complain of a pattern where management advertised open positions and occasionally even encouraged

4

Plaintiffs to apply for them, only to cancel the positions, leave them unfilled, or attach requirements to the positions that Plaintiffs did not meet. Plaintiffs point to five separate occasions.

In September 2013, Dr. Stephen Stenzler, Chief of Radiology Services and Plaintiffs' third-line supervisor, told Tonkyro that she should apply for an MRI/Ultrasound Supervisor opening. However, Stenzler later told Tonkyro that she would not be selected for the position because Medical Center Director Kathleen Fogarty wanted to fill the position with someone from outside the VA.

On January 9, 2014, the Tampa VA again posted an opening for an MRI/Ultrasound Supervisor position. However, the VA limited applications only to those with a particular professional license that Plaintiffs did not possess.

On January 26, 2015, Scott Petrillo, Plaintiffs' first-line supervisor, announced that there would be an opening for an Ultrasound Supervisor position. The VA never actually posted the position, however, deciding instead to allocate funds for a different position.

In March 2016, Petrillo announced an opening for a Lead Ultrasound Technician in the newly opened Primary Care Annex ("PCA"). Tonkyro wanted the position, but it, too, was cancelled because management decided to create a lead mammography position instead.

Finally, in April 2016, Davis applied for an Ultrasound Supervisor position. However, Davis's application was put on hold indefinitely when Angela Geraci, an ultrasound technologist, filed a bullying complaint against her. Plaintiffs allege that the bullying complaint and AIB investigation that followed were part of a conspiracy between Geraci and management to prevent Davis from obtaining the Ultrasound Supervisor position.

Next, Plaintiffs allege that management intentionally understaffed and mismanaged the radiology department. Plaintiffs point to two separate incidents. First, Plaintiffs point to the hiring of Geraci. Stenzler hired Geraci on August 24, 2015, notwithstanding that she had no prior ultrasound experience and that a hiring panel (of which Davis was a member) had deemed her unqualified. Plaintiffs allege that Geraci's incompetence increased their workload, that management treated Geraci more favorably than they treated Plaintiffs, and that Geraci spread rumors about Plaintiffs' EEOC settlements and otherwise bullied Plaintiffs. Second, Plaintiffs allege that management has allowed black mold to infest the ultrasound department since February 2015, even though Plaintiffs have complained several times.

Plaintiffs allege that their private information was made public as an act of retaliation for their EEOC activity. On February 13, 2014, Plaintiffs learned that private employee information was being stored in a folder on a computer hard

6

drive (the "S-Drive") that was accessible to all radiology department employees. The private information included various documents relating to MRI, CT, and ultrasound employees generally. The information relating to Plaintiffs in particular included: documents pertaining to Plaintiffs' EEOC complaints; emails in connection with an incident where Davis claimed she had no time to attend a mandatory life-support training; emails in connection with an incident where Davis told a patient that his ultrasound scan revealed "something" that was "not good"; and emails, notes, memoranda, and written warnings in connection with an incident where Davis and Strauser left the ultrasound duty station without permission.[3] The written warnings in connection with the latter incident were supposed to have been expunged from Davis and Strauser's personnel records under the terms of their 2013 Settlement Agreements. *See supra* n.2.

An employee accessing the S-Drive between November 15th, 2013, when the folder was uploaded, and February 19, 2014, roughly when it was removed, could learn that Plaintiffs had filed retaliation complaints, as well as the factual bases for those complaints. The employee could not learn, though, that the VA had settled Plaintiffs' 2012 sexual harassment complaints, much less the terms of Plaintiffs' Settlement Agreements.

---

[3] The only document on the S-Drive pertaining to Hernandez was an email from Hernandez to hospital staff explaining that she had sent a patient the wrong ultrasound images.

7

Finally, Plaintiffs allege that VA employees spread rumors and made disparaging comments about Plaintiffs and their EEOC activity. According to Plaintiffs, these rumors and comments ruined their professional reputations and created the general impression that Plaintiffs were troublemakers who caused problems for the radiology department.

## B.

In addition to the allegations common to all Plaintiffs, Tonkyro complains of the following. On August 23, 2013, while Tonkyro was helping a patient, Bennett walked slowly past her and glared. On March 23, 2014, Parise entered Tonkyro's work area and glared at her. On September 15, 2014, after Tonkyro transferred from the main Tampa VA hospital to the PCA, Bennett intentionally deprived her of the equipment she needed to perform her job.

## C.

In addition to the allegations common to all Plaintiffs, Strauser complains of the following. In February 2014, Graham interrupted Strauser during training and questioned her about a patient who was unhappy with the state of the hospital bathrooms. On March 18, 2014, Parise glared at Strauser and shook his head. In May 2016, Stenzler hired Strauser's ex-husband, Dr. Adam Green, to be a radiologist at the Tampa VA even though Strauser said it would be difficult for her to work with him.

8

D.

In addition to the allegations common to all Plaintiffs, Davis complains of the following.

When Davis was promoted to Lead Ultrasound Technologist on February 28, 2014, she had to wait until May to receive her formal promotion and corresponding pay increase.

On March 25, 2014, Parise entered the ultrasound department unaccompanied, even though this violated a previous agreement between Plaintiffs and management. The next day, Parise again entered the ultrasound department and glared at Davis. Between August 2013 and March 2014, Bennett would glare at Davis whenever the two were in close proximity.

On August 1, 2014, management denied Davis's request for a compressed work schedule even though it had approved such schedules for other ultrasound technologists in the department.

On April 25, 2014, Davis took extended leave due to a work-related injury. Management initially informed Davis that she would not be permitted to return to work at the Tampa VA, but would instead be assigned to the PCA. Davis then told management that she felt she was being retaliated against for her EEOC complaints. The human resources department then informed Davis that

management had had a "change of heart," and that she would be permitted to return to the Tampa VA after all.  Davis returned on February 17, 2015.

Upon returning to work at the Tampa VA, Petrillo treated Davis differently from how he treated other ultrasound technologists.  Specifically, Petrillo maintained a physical distance from Davis that made it difficult for Davis to discuss patients with him.  He also kept the door open when he met with Davis, although he closed the door when meeting with other technologists.

## E.

In addition to the allegations common to all Plaintiffs, Hernandez complains of the following.

On August 27, 2015, Geraci told Hernandez that her breasts were size double D, and pulled up her blouse to show Hernandez the outline of her breasts through her undershirt.  A few days later, Geraci—during a conversation with Hernandez about transvaginal ultrasounds—asked Hernandez "Why don't you just let me borrow your vagina?"  On September 3, 2015, Geraci approached Hernandez and asked "Is the vagina here?," and made a gesture of inserting something into her vagina.  Hernandez reported Geraci's behavior to Petrillo.  Petrillo conducted a fact finding and gave both Geraci and Hernandez a verbal warning.

10

On September 10, 2015, Geraci stated that she enjoyed working at the Tampa VA, but could not stand the fact that she had to work with "dirty vaginas." On September 18, 2015, Geraci gave Hernandez "an angry, hostile look." On September 21, 2015, Geraci refused to speak with Hernandez when Hernandez approached her about a patient.

At some time in October 2015, Geraci gave Hernandez a high five and "chest bumped" her. On multiple occasions in October and November 2015, Hernandez saw Geraci scan her own abdomen with an ultrasound transducer. In November 2015, Geraci told Hernandez, in a "condescending and hostile" tone, to use Hernandez's own assigned room. In December 2015, Geraci referred to a radiology resident as "Dark Chocolate" and described "all the things she would do" to attract him.

In December 2015 and January 2016, Geraci gave Hernandez "dirty looks," made disparaging remarks about Hernandez's eating disorder, and told Hernandez "Oh my God, you are obsessed over the stupidest shit ever." On multiple occasions, Geraci gave Hernandez disgusted looks while Hernandez was eating, and, on one occasion, said "I can't believe you're going to eat all that."

In January 2016, Geraci embraced Hernandez and kissed her on the cheek after she told Geraci that her patient had cancelled an appointment. On another occasion, Geraci caused Hernandez to be late for an appointment with a patient

11

because Geraci took 50 minutes to perform an ultrasound that should have taken 30 minutes.

In February 2016, Geraci entered a room in which Hernandez was performing an ultrasound and demanded that Hernandez leave the room. On February 17, 2016, while Geraci was chaperoning Hernandez for a transvaginal ultrasound, Geraci interrupted Hernandez and told her to "hurry up." On February 19, 2016, Geraci told Hernandez, in an angry tone, that it was her responsibility to close the examination rooms when she was done. That same day, Geraci asked Hernandez, "in a condescending and angry tone," whether she completed her outpatient requests. Hernandez reported these incidents to Petrillo, but Petrillo took no action.

In March 2016, Hernandez observed Geraci embrace Brent Burton, a male ultrasound technologist, in an inappropriate manner. Hernandez also observed Geraci sit on Burton's lap and wrap her arms around his neck. On multiple occasions in 2016, Geraci pulled up her shirt to reveal her abs to Hernandez despite knowing that Hernandez did not want to see them. When Hernandez reported Geraci's behavior to Petrillo, he responded that he had more pressing issues to deal with.

Hernandez also alleges that Petrillo refused to supply her with needed equipment. For instance, Petrillo failed to fix a stretcher in the ultrasound room in

12

which Hernandez worked, even though Hernandez repeatedly told him that it was causing her physical pain and affecting her ability to care for patients.

Hernandez also alleges that she was mistreated by Victor Martinez, another ultrasound technologist. On multiple occasions in 2016, Martinez teasingly asked Hernandez where her "best friend" was, referring to Geraci. Martinez also repeatedly told Hernandez that he was going to accuse her of harassment and take her job. On one occasion, Martinez "became hostile towards" Hernandez because Hernandez refused to perform a scan that had been assigned to Martinez.

Finally, Hernandez alleges that Petrillo holds her to a different standard than males in the department. According to Hernandez, female ultrasound technologists are given a greater volume of work and less time off than male ultrasound technologists. On June 12, 2015, for example, Petrillo denied Hernandez's request for leave while granting the request of a more junior male employee.

F.

In June 2016, three radiologists—Dr. Thornton Eastham, Dr. Aaron Andrews, and Dr. Katie Bailey—sent an anonymous letter to Joseph Battle, Director of the Tampa VA, that corroborates many of Plaintiffs' allegations. The letter accuses radiology management of "managerial incompetence and neglect, abuse of leadership position, fraud, administrative policy violations, and other behaviors such as nepotism, retaliation, and intimidation." With respect to

13

retaliation, the letter alleges that "[e]mployees engaged in EEO or other complaints of wrongdoing against the leadership are subjected to retaliatory behavior including intentional creation of a hostile work environment, derogatory statements about these employees in front of other staff, exclusion from advancement or promotion within the department, and specific assignment of undesirable tasks or duties." The letter continues: "Employees are told verbally that communication or testimony regarding any violations or accusations of wrongdoing will be learned of immediately by the leadership and retaliated against accordingly."

## G.

On November 7, 2018, the District Court entered summary judgment in favor of the Secretary. The Court found that Plaintiffs failed to carry their burden under *McDonnell Douglas* because the conduct underlying their discrete retaliation claims was either insufficiently adverse or supported by legitimate nonretaliatory explanations. As to Plaintiffs' hostile work environment claims, the Court found that the conduct Plaintiffs complained of was not sufficiently severe or pervasive. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*. *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). In doing so, we view the evidence in the light most favorable to, and draw all reasonable inferences in favor

of, the non-moving party. *Id.* Summary judgment is proper when the moving party is entitled to judgment as a matter of law because of a lack of any genuine issue of material fact. Fed. R. Civ. P. 56(c).

After careful consideration, we conclude the District Court's entry of summary judgment was proper as to Plaintiffs' discrete retaliation claims. We reach the same conclusion about Hernandez's sex-based hostile work environment claim. After summary judgment was entered in this case, a decision from this Court clarified that retaliatory hostile work environment claims are not governed by the "severe or pervasive" standard applied by the District Court here. *Monaghan v. Worldpay U.S. Inc.*, 955 F.3d 855, 862 (11th Cir. 2020). We therefore vacate the part of the District Court's order dealing with that claim and direct the Court to analyze the claim consistent with our intervening decision.

### III.

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e–3(a). We have noted that § 2000e–16 was intended "to make Title VII applicable in the federal workplace to the same extent that it was already applicable in the non-

federal workplace." *Llampallas v. Mini–Circuits, Lab, Inc.,* 163 F.3d 1236, 1243 (11th Cir. 1998).

## A.

A plaintiff may establish a retaliation claim using either direct evidence or circumstantial evidence. *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir. 2004); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson*, 376 F.3d at 1086 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)) (internal quotation marks omitted). If believed, direct evidence "proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Board of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). "'Only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor" constitute direct evidence. *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). A statement is not direct evidence of retaliation unless it is made by a person involved in the allegedly

16

retaliatory action and unless the statement relates to that action.[4] *See Trotter v. Bd. of Trustees*, 91 F.3d 1449, 1453–54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."). When, by contrast, an "alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson*, 376 F.3d at 1086 (citing *Burrell*, 125 F.3d at 1393).

Plaintiffs argue that the record contains direct evidence of retaliatory intent from several actors, including Stenzler, Parise, Battle, Bennett, and Chief of Staff Edward Cutolo. However, all of the statements that Plaintiffs point to either indicate retaliatory intent only inferentially or are insufficiently connected with any specific retaliatory action.

---

[4] Before *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006), we said that for a statement to be direct evidence, it must "be made by a person involved in the *challenged decision*," *Trotter v. Bd. of Trustees*, 91 F.3d 1449, 1453–54 (11th Cir. 1996) (emphasis added), and that "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). These decisions reflect the pre-*Burlington Northern* mindset that a cognizable retaliation injury need be employment related. In light of *Burlington Northern*'s holding that a cognizable injury need not flow from an employment decision, it is more accurate to say that a statement is not direct evidence unless it is made by a person involved in the allegedly retaliatory action—whether an employment-related decision or not—and unless the statement relates to that challenged action.

Consider three statements from Stenzler that Plaintiffs call direct evidence. First, Stenzler told Tonkyro that Cutolo and Fogarty "would not allow [her] to become a supervisor." Tonkyro responded that she "believed [it] was because of [her] EEO activity and the 'headache [she] caused Mrs. Fogarty, that [she] would not be allowed to advance to a supervisor position.'" Stenzler responded, "[P]robably not." Second, Stenzler told Eastham that Davis would never be a supervisor. Third, Stenzler said that Plaintiffs were causing problems for the ultrasound department by filing frivolous EEOC complaints. Stenzler made the third statement over three years after he made the first two statements.

Stenzler's first two statements are direct evidence only of the fact that Stenzler thought that Tonkyro and Davis would not be selected for supervisory positions. The statements betray nothing about Stenzler's motives. At most, Stenzler's first statement affirms, though ambiguously, Tonkyro's suspicions about *Fogarty's* retaliatory motives. But this constitutes mere circumstantial evidence of Fogarty's retaliatory intent, since an ambiguous statement about another person's subjective intent cannot be direct evidence of that intent. *See Wilson*, 376 F.3d at 1086 ("If [an] alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."). Stenzler's third statement is strong evidence that he was annoyed by Plaintiffs' EEOC activity, but the statement has

no apparent connection with any retaliatory act by Stenzler.  Therefore, Stenzler's statements constitute only circumstantial evidence.

Plaintiffs also point to five alleged statements by Parise.  First, at a lunch meeting with other radiologists, Parise stated that he would see the testimony given in the AIB investigation into Plaintiffs' 2012 EEOC complaints and "would know who said what about him."  Second, in an informal meeting with other physicians, Parise stated: "I [] choose not to go down [to the ultrasound department] because if I do I'll stick my fucking foot down [the ultrasound technicians'] throats."[5]  Third, Parise allegedly discussed Plaintiffs' EEOC settlements publicly, saying that Plaintiffs had received "something in the order of $50,000 each," that Bennett "had accepted a punishment," but that he (Parise) "wasn't accepting his" and "was going to fight it."  Fourth, Parise told Eastham that "someone in the director's office was saying that [Plaintiffs] were going to get fired because there was so much in-fighting going on."  Finally, when it was announced that Davis would be taking maternity leave, Parise yelled "Yes" and made "an arm jerking motion to suggest a celebratory action."

---

[5] Under the terms of the Settlement Agreements, Plaintiffs waived the right to pursue claims based on Parise's first and second statements.  *See supra* p.3.  Plaintiffs argue, though, that the statements may nonetheless be considered as background evidence "relevant to intentions."  We assume without deciding that Plaintiffs are correct, and therefore consider the statements as possible direct evidence of retaliatory intent.

As an initial matter, we note that Plaintiffs do not allege that Parise retaliated against them by denying them promotions.  It is undisputed that Parise had no decisionmaking authority in this respect.  Rather, Plaintiffs allege that Parise retaliated against them by spreading rumors and making derogatory comments.  Indeed, the retaliation alleged from Parise consists in the very statements that Plaintiffs use as direct evidence.  In other words, Plaintiffs argue that Parise's statements constitute direct evidence of why he made those statements.  This argument is untenable.

Take, for instance, Parise's first and third statements, which are the only ones that facially pertain to Plaintiffs' EEOC activity.  Even assuming Parise made the first statement because he wanted to intimidate other radiologists from testifying against him in the AIB proceedings, we are still left to infer about the motivation underlying the intimidation.  It is certainly possible that Parise was motivated to retaliate against Plaintiffs because of their EEOC activity.  It is equally possible that he was driven by self-preservation, fearing that he may lose his job if anything negative came to light.

The motivations behind Parise's third statement are equally ambiguous.  He may have shared the terms and circumstances of the settlements as an act of retaliation.  Or, he may have simply been boasting that he, unlike Bennett, was not

20

going to accept his punishment and "was going to fight it."[6]  In sum, Parises's

statements are not the sort of "blatant remarks[] whose intent could be nothing

other than to discriminate."  *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter*, 870

F.2d at 582).

The alleged statements from Battle, Bennett, and Cutolo are not direct

evidence for the same reasons.[7]  Therefore, Plaintiffs' case is based only on

circumstantial evidence.

---

[6] The fact that Parise understated the settlement amounts by $90,000 to $95,000 suggests, at least, that he was motivated by something other than a desire to accurately reveal the confidential terms of the settlements.  While Parise said that Plaintiffs had received "something in the order of $50,000 each," Tonkyro in fact received $145,000, Davis received $145,000, and Strauser received $140,000.

[7] Plaintiffs argue that Battle directly revealed his retaliatory intent in his deposition when he stated that he did not sign an AIB report about Davis's bullying of Geraci because he first "wanted to be sure . . . that there wouldn't be anything retaliatory about it because I don't have any interest in retaliating against anybody."  We are unconvinced by Plaintiffs' paradoxical argument that Battle somehow revealed his retaliatory intent by stating that he had no intent to retaliate.

Plaintiffs also argue that direct evidence of Bennett's retaliatory intent consists in his ordering an employee to upload confidential employee information to the public S-Drive.  But an act cannot constitute direct evidence that the act was retaliatory unless the intent behind the act "could be nothing other than to discriminate."  *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).  As explained *infra* pp. 32–34, that is not the case here.

Finally, Plaintiffs point to a statement Cutolo made to Bailey blaming certain "problem technologists" for issues in the radiology department.  Because this statement was not made in connection with any alleged act of retaliation, it does not constitute direct evidence.  And, to the extent the retaliation alleged is the statement itself, we reject the notion that an ambiguous statement such as this one can constitute direct evidence that it was made with retaliatory intent.

B.

When a plaintiff attempts to prove her case using only circumstantial evidence, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). This framework puts the initial burden on the plaintiff to establish a *prima facie* case of retaliation. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Eskra v. Provident Life and Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997). To establish a *prima facie* case, a plaintiff must show that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970 (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

If the plaintiff establishes a *prima facie* case, a presumption arises "that the adverse action was the product of an intent to retaliate." *Gogel v. Kia Motors Manufacturing of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). "The burden then shifts to the employer to 'articulate' a legitimate, non-discriminatory reason for its action." *Schoenfeld*, 168 F.3d at 1267 (quoting *Texas Dep't. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55, 101 S. Ct. 1089, 1094–95 (1981)). "If the employer offers such legitimate reasons for the employment action, the plaintiff

22

must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Crawford*, 529 F.3d at 976 (quoting *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (*per curiam*)).  "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

The parties agree that Plaintiffs established the first element of their *prima facie* case—that they engaged in activity protected under Title VII—but they disagree about whether Plaintiffs suffered adverse employment actions and, if so, whether those adverse employment actions were causally connected to Plaintiffs' protected activity.

Plaintiffs allege the following adverse employment actions: (1) they were denied opportunities for advancement; (2) private information relating to their EEOC activity was published on the S-Drive; and (3) VA employees spread rumors and made disparaging comments about Plaintiffs and their EEOC activity. Because we believe that the first two actions fail at the pretext stage of *McDonnell Douglas*, we will assume arguendo that Plaintiffs established a *prima facie* case in connection with them.  Below, we consider whether Plaintiffs established a *prima facie* case of retaliation for the rumors and disparaging comments.

An employment action is only "adverse" if the action "would have been materially adverse to a reasonable employee or job applicant." *Burlington N. &*

23

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006).

Generally, "that means that the employer's actions must be harmful to the point

that they could well dissuade a reasonable worker from [engaging in protected

activity]." *Id.*  Title VII does not protect against "those petty slights or minor

annoyances that often take place at work and that all employees experience." *Id.* at

68, 126 S. Ct. at 2415.  "[T]he sporadic use of abusive language, gender-related

jokes, [] occasional teasing," and the like do not generally rise to the level of

material adversity.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct.

2275, 2284 (1998).

The essential question here is whether the rumors and comments about

Plaintiffs are mere "petty slights [and] minor annoyances" of the sort which Title

VII does not redress, or whether they are sufficiently severe to dissuade a

reasonable employee from engaging in EEOC activity.  In evaluating the severity

of the rumors and comments, we must consider the context and circumstances in

which they were uttered.  *See Burlington*, 548 U.S. at 69, 126 S. Ct. at 2415

("[T]he significance of any given act of retaliation will often depend upon the

particular circumstances.").  However, we must not consider the rumors and

comments in the aggregate, as with a hostile work environment claim.  *See Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 S. Ct. 2061, 2073

(2002) (noting that discrete retaliation claims are different from hostile work

24

environment claims because the former are based on individual acts, while the latter "are based on the cumulative effect of individual acts"); *see also Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014) ("Unlike a hostile work environment claim . . . a discrete-acts claim involves a single act of discrimination . . . ."). Instead, we must evaluate the severity of each statement independently—a statement is not sufficiently adverse unless it, standing alone, "could well dissuade a reasonable worker from [engaging in protected activity]." *Burlington*, 548 U.S. at 57, 126 S. Ct. at 2409.

Plaintiffs base their retaliation claims on the following rumors and comments.[8] Stenzler said that Plaintiffs and their "frivolous" EEOC complaints were responsible for the ultrasound department's failures; Parise told other radiologists that they should be careful if they go down to the ultrasound department because they might get an EEOC complaint filed against them; Parise told others that the ultrasound technologists were going to be fired for in-fighting; Parise yelled "Yes" and made a celebratory gesture when it was announced that Davis would be taking maternity leave; unidentified coworkers called Plaintiffs

---

[8] Plaintiffs base their claims in part on statements that were made before the 2013 Settlement Agreements. As part of the Settlement Agreements, Plaintiffs waived their rights to pursue actions "which were raised or could have been raised" in the 2012 EEOC complaints, as well as "future causes of action against the [VA] based on such actions in existence" at the time of the settlements. The District Court rejected Plaintiffs' claims to the extent they were based on statements subject to the waiver, and Plaintiffs do not argue that this was error. Therefore, we consider only the statements that were not subject to the waiver.

"money-grubbing bitches"; and Cutolo stated that the ultrasound technologists were causing problems for the radiology department. In addition to these discrete comments, Plaintiffs point to the deposition testimony of four different radiologists to establish that there were rumors circulating about their EEOC activity. Dr. Eastham, Dr. Lenny Chuang, Dr. Marla Hersh, and Dr. Bailey testified that they had heard, either from Parise or elsewhere, that Plaintiffs had filed EEOC complaints and obtained money settlements from the VA. Two of them also testified that this was "common knowledge" and that "the whole department knew about [it]."

In the aggregate, these rumors and comments caused Plaintiffs two significant types of harm. First, they harmed Plaintiffs' professional reputations by creating the impression that Plaintiffs, as employees, are a liability. Eastham testified that hospital employees in Pasco County, Bay Pines, and Vero Beach—all between 25 and 150 miles of Tampa—have the impression that the ultrasound department in the Tampa VA is filled with litigious "troublemakers" who "want all the doctors to be fired." Second, confidential information about Plaintiffs' EEOC activity was made known to their coworkers and even to many hospital employees across central Florida. We have little doubt that a reasonable employee may well be dissuaded from filing an EEOC complaint if she knew that she would henceforth be regarded by her colleagues and superiors—and even by others in the

local industry—as a nuisance and a liability. Likewise, if an employee knew that any complaint she makes, and the details of any resulting settlement, would become the favorite subject of lunchtime discussions, she may rather tolerate harassment or discrimination than gossip and infamy.

The problem for Plaintiffs, however, is that these harms do not flow from any single rumor or comment, but from all the rumors and comments in the aggregate. Because Plaintiffs have failed to identify any single statement that is materially adverse on its own, we conclude that Plaintiffs have failed to establish a *prima facie* case on this part of their retaliation claims.

C.

We have assumed a *prima facie* case of retaliation based on the denial of opportunities for advancement and the S-Drive incident. We now address the Secretary's proffered explanations for those actions and whether Plaintiffs demonstrated that those explanations are pretext. Because we find that Plaintiffs failed to show pretext, we conclude that the District Court properly granted summary judgment on Plaintiffs' retaliation claims.

To determine whether an employer's proffered explanations are pretext, the district court must "evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

27

factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). "[A] reason is not pretext for [retaliation] unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.'" *Gogel*, 967 F.3d at 1136 (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (internal quotation marks omitted) (alterations in original)). In showing that retaliation was the real reason for the action, the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or action of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 2533 (2013). In other words, the plaintiff's protected activity must be a but-for cause of the adverse action.[9] *Id.*

We begin with the Secretary's proffered explanations for denying Plaintiffs opportunities for advancement. In their affidavits and depositions, Plaintiffs claimed they were retaliated against in connection with five different job openings:

---

[9] Plaintiffs argue that a more lenient causation standard than the one articulated by the Supreme Court in *Nassar* applies to Title VII retaliation actions against federal employers under § 2000e–16. However convincing Plaintiffs' argument may be in light of the Supreme Court's decision in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the argument is foreclosed by binding circuit precedent in *Trask v. Secretary of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016). *See Garrett v. Univ. of Ala. at Birmingham*, 344 F.3d 1288, 1292 (11th Cir. 2003) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point."); *Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) ("[W]e are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court.").

the September 2013 opening for MRI/Ultrasound Supervisor, the January 2014 opening for MRI/Ultrasound Supervisor, the January 2015 opening for Ultrasound Supervisor, the March 2016 opening for Lead Ultrasound Technician at the PCA, and the April 2016 opening for Ultrasound Supervisor. However, Plaintiffs made no argument about the September 2013, January 2014, or January 2015 openings in their memorandum in opposition to summary judgment before the District Court. We therefore find that Plaintiffs have abandoned those particular claims. *See Finnegan v. Comm'r of Internal Revenue*, 926 F.3d 1261, 1271 (11th Cir. 2019) ("The general rule is that we will not consider an issue raised for the first time on appeal."). Below, we consider the Secretary's proffered explanations in connection with the other two positions.

Regarding the March 2016 Lead Ultrasound Technician opening, the Secretary explained that Tonkyro was not selected because management decided that it would better meet the department's needs to create a lead mammography position in the main hospital instead. Plaintiffs argue that this reason is pretextual because mammography was overstaffed and did not need a new lead position. The only evidence Plaintiffs use to support their pretext argument, however, is the deposition testimony of a mammography technologist who expressed the opinion that three mammography technologists were too many for the patient load, space, and equipment at the Tampa VA. This testimony does not support Plaintiffs'

29

argument because it says nothing about whether the department needed a new *lead* position, as opposed to a new technologist position. And, even if the technologist had testified that a new lead position would be unnecessary, such testimony would be insufficient to establish pretext. To question the legitimacy of a staffing decision on the basis of such testimony would violate the principle that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) (quotation marks omitted). Therefore, Plaintiffs failed to establish pretext in connection with the March 2016 position.

With respect to the April 2016 Ultrasound Supervisor opening, the Secretary explained that Davis had not been selected because management put her application on hold because of the AIB investigation into Geraci's allegations that Davis had been bullying her. Plaintiffs argue that the AIB investigation was orchestrated specifically to give management a facially non-retaliatory reason to deny Davis the position.

Plaintiffs' theory is as follows. Geraci wanted to be transferred to the New Port Richey clinic, and management wanted to prevent Davis from obtaining the Ultrasound Supervisor opening. So, Geraci and management entered a conspiracy

30

to achieve these ends.[10]  Geraci filed a complaint falsely accusing Davis of bullying her, and management empaneled an AIB to investigate the accusations. The AIB investigation provided a pretext both for Geraci to be transferred to New Port Richey and for Davis's application to be put on hold, at least temporarily.

There are at least two problems with Plaintiffs' theory.  First, there is no evidence that the various actors involved in the AIB process conspired to achieve the ends alleged.  Geraci testified that she decided to write a letter to Stenzler about Davis's bullying on her own initiative.  Geraci was not prompted to write the letter or told that writing it would cause her to be transferred to New Port Richey.  After Geraci wrote the letter, Stenzler referred the matter to Cutolo and Battle, who decided to initiate an AIB investigation.  Nothing in the record suggests that Cutolo or Battle initiated the investigation as part of a conspiracy with Geraci, Petrillo, or Stenzler.  Second, the AIB panel's conclusion that Davis had been bullying Geraci undermines the notion that the allegations were fabricated.  The panel was composed of three individuals from outside the radiology department who, as far as the record shows, had no knowledge of Davis's EEOC activity.  The panel concluded that Geraci had been bullied, and recommended remedial training and teambuilding exercises.  Nothing in the record suggests any improper motive

---

[10] Geraci could not simply request a transfer to New Port Richey because the positions there were competitive, and employees more senior to her would have had priority.

or impartiality on the part of the panel. Instead, the record reflects that the panel conducted a thorough investigation, interviewed several witnesses, and reached a conclusion based on the evidence. Therefore, Plaintiffs have failed to show that the AIB investigation was a pretext to deny Davis the Ultrasound Supervisor position.

We now consider the Secretary's proffered explanation regarding the S-Drive incident. Plaintiffs' allegation is that Bennett told Carolyn Eubanks, who was Plaintiffs' first-line supervisor at the time, to upload Plaintiffs' private information to the S-Drive as an act of retaliation. The Secretary explained that the information was placed on the S-Drive not as an act of retaliation, but rather to facilitate the transfer of employee personnel files. Specifically, Bennett instructed Eubanks to place the files on the S-Drive so that Mario DeLeon, who was taking over Eubanks' role as supervisor, could download the files to his personal computer. Though the files were supposed to be removed from the S-Drive once DeLeon downloaded them, by oversight they remained for three months. This explanation was supported by Eubanks' deposition testimony, but contradicted by Bennett's, who said he never told Eubanks to put the files on the S-Drive. A reasonable jury could certainly disbelieve Bennett, but the key question is whether a reasonable jury could conclude that Bennett would not have told Eubanks to upload the files but-for his retaliatory intent.

32

As previously discussed, there is no direct evidence linking the S-Drive incident with Bennett's retaliatory intent. If such a link is to be made, therefore, it is through circumstantial evidence. There is plenty of evidence suggesting that Bennett harbored animosity toward Plaintiffs, including glaring at Plaintiffs on multiple occasions and making snide comments about Plaintiffs to others. Putting this evidence together with the fact that Plaintiffs filed EEOC complaints against Bennett and obtained settlements, a jury could conclude that Bennett harbored animus toward Plaintiffs because of their EEOC activity. The question remains, however, whether a jury could conclude that the S-Drive incident was a product of Bennett's retaliatory animus.

To raise a genuine issue as to whether the S-Drive incident was retaliatory, Plaintiffs were required to meet the Secretary's proffered explanation "head on and rebut it," *Wilson*, 376 F.3d at 1088, to show that the explanation is "unworthy of credence," *Combs*, 106 F.3d at 1538. Plaintiffs failed to do so. Eubanks testified in her deposition that she was having trouble transferring her files to DeLeon, that "it was extremely time consuming," and that she "was not getting any help from the [Information Resource Management Systems Department]" as to the proper way to transfer the files. There is no evidence showing that Eubanks was not, in fact, struggling to transfer her files. Bennett testified that he did not know the contents of the folder that was uploaded to the S-Drive, and there is no evidence to

33

the contrary.  There is no evidence that Bennett told anyone that Plaintiffs' private information was on the S-Drive, as one might expect if the incident had been retaliatory.  There is no evidence that anyone other than Plaintiffs and the two individuals who brought the issue to Plaintiffs' attention ever noticed that the files were on the S-Drive.  There is no evidence that the files were not removed in a timely manner once the issue was flagged.  On the contrary, Stenzler, Bennett, and Graham removed the files within a few days.  Finally, there is no evidence that Plaintiffs were in any way singled out by the incident.  Rather, the incident compromised the privacy of patients and employees across the radiology department, regardless of whether they had engaged in EEOC activity.

To be sure, it is irresponsible to place confidential files on a drive accessible to employees who have no business seeing them.  It is not at all implausible, though, that unsound judgment might consider it an expedient means of transfer, and that the files might then remain exposed through carelessness or oversight.  Met with such an explanation, Plaintiffs were required to raise doubt that the incident was more than plain irresponsibility.  They failed to do so.[11]

---

[11] One final point: If an act of retaliation, the S-Drive incident was not a particularly well-calculated one.  Assuming Eubanks and DeLeon were not co-conspirators with Bennett (and there is no evidence they were), the expected course of events would be as follows.  Bennett tells Eubanks to upload the files to the S-Drive on her last day of work.  Eubanks does so, then DeLeon downloads them and promptly removes them from the S-Drive.  Assuming DeLeon's first day was Eubanks' last, this leaves Plaintiffs' information exposed for a matter of hours.  Unless Bennett plans to download the files himself during these few hours and distribute them throughout the VA and beyond (and there is no evidence that he did), his plan will not likely do

For the foregoing reasons, we conclude that Plaintiffs failed to carry their burden under *McDonnell Douglas*. The District Court therefore properly entered summary judgment on Plaintiffs' discrete retaliation claims.

IV.

Title VII prohibits the creation of a hostile work environment in retaliation for an employee's protected activity, 42 U.S.C. § 2000e–3; *Gowski*, 682 F.3d at 1312, or because of the employee's "race, color, religion, sex, or national origin," § 2000e–2; *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993).

We first recognized a cause of action for retaliatory hostile work environment in *Gowski*. In that opinion, we said such claims are analyzed under the same standard as substantive hostile work environment claims—that is, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gowski*, 682 F.3d at 1311 (quoting *Harris*, 510 U.S. at 21, 114 S. Ct. at —). It is understandable, then, that the District Court below applied the "severe or pervasive" standard to Plaintiffs' retaliatory hostile work environment

Plaintiffs much harm. It is only by accident that Plaintiffs' information remained exposed for as long as it did, owing either to DeLeon's failure to remove the files from the S-Drive or Eubanks' failure to tell him to.

claims.  After the District Court's order, however, we issued an opinion in

*Monaghan v. Worldpay U.S. Inc.*, rejecting *Gowski*'s "severe or pervasive"

standard as inconsistent with the Supreme Court's decision in *Burlington Northern*

and our earlier decision in *Crawford* (applying *Burlington Northern*'s retaliation

standard).  955 F.3d 855, 862 (11th Cir. 2020).  Instead, we said retaliatory hostile

work environment claims, like retaliation claims based on discrete acts, prevail if

the conduct complained of "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  *Id.* at 862–63 (quoting

*Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415).

Because the District Court analyzed Plaintiffs' retaliatory hostile work

environment claims under *Gowski*, we vacate that part of the judgment and direct

the Court to instead apply *Burlington Northern* on remand.  Hernandez's hostile

work environment claim based on sex, by contrast, was properly analyzed under

the "severe or pervasive" standard.  Our analysis of that claim follows.

To establish a sex-based hostile work environment, a plaintiff must show

that "the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  *Miller v. Kenworth of*

*Dothan, Inc.*, 277 F.3d 1269, 1275 (11th. Cir. 2002) (quoting *Harris*, 510 U.S. at

21, 114 S. Ct. at 370).  To be sufficiently "severe or pervasive," the employer's

36

actions "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] . . . to be abusive." *Id.* at 1276 (quotation marks omitted). "In evaluating the objective severity of the harassment," we look to the totality of the circumstances, including: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

The standards for judging hostility are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283. "Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (internal quotation marks omitted). "[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 (quotation marks omitted) (citation omitted).

In addition to establishing that the employer's actions were sufficiently "severe or pervasive," a plaintiff must show that the actions were based on her sex rather than some other unprotected characteristic. *Mendoza v. Borden, Inc.*, 195

F.3d 1238, 1245 (11th Cir. 1999) (en banc).  To do so, she "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

Hernandez's sexual harassment claim is based primarily on Geraci's conduct.  Hernandez complains of several incidents: Geraci pulled up her blouse to show Hernandez the outline of her breasts through her undershirt; Geraci made inappropriate jokes to Hernandez, using the word "vagina"; Geraci made a gesture of inserting something into her vagina to Hernandez; Geraci gave Hernandez an angry look; Geraci ignored Hernandez on multiple occasions; Geraci gave Hernandez a "chest bump"; Geraci scanned her own abdomen with an ultrasound transducer in Hernandez's presence, and revealed her abs to Hernandez multiple times; Geraci spoke to Hernandez in a "condescending and hostile tone"; Geraci insulted Hernandez about her eating disorder; Geraci embraced Hernandez and kissed her on the cheek; and Hernandez observed Geraci interacting with a male coworker in an inappropriately flirtatious manner.  Hernandez also bases her claim on Petrillo's failure to remedy the sexually hostile work environment created by Geraci.

As an initial matter, most of Geraci's conduct lacks "the necessary sexual or other gender-related connotations to be actionable sex discrimination." *Mendoza*, 195 F.3d at 1247.  We have noted that "Title VII does not prohibit profanity alone,

38

however profane . . . [nor] harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007). "[S]exual language and discussions that truly are indiscriminate do not themselves establish sexual harassment under Title VII." *Reeves*, 594 F.3d at 809. "[W]orkplace harassment . . . is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998)).

Here, Hernandez failed to raise a genuine issue of fact that Geraci's conduct was based on Hernandez's sex. In making this inquiry, we are guided by the "common-sense rule that the context of offending words or conduct is essential to the Title VII analysis." *Id.* at 810.

Consider the context in which Geraci revealed the outline of her breasts to Hernandez. The incident occurred during a conversation about a male doctor to whom Geraci was attracted. Hernandez told Geraci that the doctor preferred "big breasts," and Geraci proceeded to lift up her shirt to prove that she was the doctor's type. Nothing in the record allows the conclusion that Geraci's conduct had anything to do with Hernandez's sex.

39

Similarly, the context surrounding Geraci's inappropriate touching of Hernandez shows that the touching was not sex based. Geraci "chest bumped" Hernandez after learning of her employment benefits and giving Hernandez a high-five. Nothing in the record suggests that the bump was anything more than a mere celebratory gesture, as the context and the definition of the phrase suggest. *See* Macmillan Dictionary, *Chest Bump*, https://www.macmillandictionary.com/us/dictionary/american/chest-bump (last accessed Dec. 29, 2020) (defining "chest bump" as "an action in which two people bump their chests together, usually as a celebration"). Geraci's decision to embrace Hernandez and kiss her on the cheek was similar—Geraci did so after Hernandez told her that Geraci's patient cancelled an appointment.

Likewise, the record shows that Geraci's use of the word "vagina" occurred first in the context of a discussion about transvaginal ultrasounds. Then, apparently realizing that her talk of vaginas bothered Hernandez, Geraci began teasing Hernandez with the word. "Even gender-specific terms cannot give rise to a cognizable Title VII claim if used in a context that plainly has no reference to gender." *Reeves*, 594 F.3d at 810. Although the word "vagina" is plainly gender-specific, Geraci's use of it was not gender-derogatory. *Compare id.* at 811–12 (a jury could find that the use of the words "whore," "bitch," and "cunt," together with "vulgar discussions of women's breasts, nipples, and buttocks" "contributed

40

to conditions that were humiliating and degrading to women on account of their gender").

Finally, there is no evidence suggesting that the angry looks, harsh words, and silent treatment that Geraci gave Hernandez were because of Hernandez's sex. On the contrary, the record suggests that Geraci was angry at Hernandez because Hernandez reported Geraci for sexual harassment.

Even if Geraci's conduct was based on Hernandez's sex, Hernandez's claim would still fail because the conduct is insufficiently severe or pervasive to alter the terms and conditions of Hernandez's employment. "[W]e proceed with common sense, and an appropriate sensitivity to social context, to distinguish between general office vulgarity and the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Reeves*, 594 F.3d at 811 (quotation marks omitted) (alterations adopted).

In *Mendoza*, we said that a male supervisor's conduct was not threatening or humiliating to a female employee when that conduct included telling the employee he was "getting fired up," making sniffing sounds while staring at the employee's crotch, brushing his hip against the employee's hip, and following the employee around the workplace. 195 F.3d at 1248–49.

In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, by contrast, we held that an employee was sexually harassed when her male coworker

41

repeatedly told her she had a sexy voice, winked at her, exposed the imprint of his private parts to her through his pants, gazed at her body in a sexual manner, repeatedly attempted to massage her shoulders, rubbed his body parts against her, and asked her questions about her sex life, among other things.  234 F.3d 501, 506 (11th Cir. 2000).

Geraci's conduct toward Hernandez is significantly less severe than the conduct at issue in *Johnson*, and likely less severe than the insufficiently severe conduct in *Mendoza*, as well.  Unlike those cases, some of Geraci's conduct was merely witnessed by Hernandez rather than directed at her—namely, Geraci scanning her own abdomen, embracing a male coworker, and sitting on his lap. And the physical conduct that Geraci did direct toward Hernandez—pulling up her shirt, chest bumping, hugging, and kissing Hernandez—is, as explained above, qualitatively different from the sexually charged conduct in *Johnson* and *Mendoza*.

In sum, Geraci's conduct is of an entirely different nature from the sexually predatory conduct at issue in *Johnson* and *Mendoza*.  Such conduct is insufficiently severe or pervasive to alter the terms and conditions of Hernandez's employment.

Finally, Hernandez alleges that Petrillo held her to a different standard than similarly situated males in the ultrasound department.  In particular, Hernandez complains that Petrillo denied her request for leave, while granting the request of a male employee with less seniority.  This, however, is a quintessential "isolated

42

incident[]" of the sort that is insufficient to alter the terms and conditions of employment.  *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283.

For the foregoing reasons, the District Court properly granted summary judgment for the Secretary on Hernandez's sex-based hostile work environment claim.

V.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

APPENDIX

**James A. Haley VA Organizational Structure (2012)**



# James A. Haley VA Organizational Structure (2016)

