[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-12698

Non-Argument Calendar

————————————————

MARECIA S. BELL,

Plaintiff-Appellant,

*versus*

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-01274-VMC-CPT

————————————————

Before ROSENBAUM, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Marecia Bell, a Black woman, has been a nurse at the James A. Haley Veterans' Hospital in Tampa (the "Tampa VA Hospital") for decades. She claims that, after she took a promotion in October 2016, she was subjected to race discrimination and retaliation for her protected equal-employment-opportunity ("EEO") activity. According to Bell, that retaliation continued even after she transferred to another position at the hospital to escape the discriminatory treatment. The district court granted summary judgment in favor of the Secretary of Veterans Affairs, and Bell appeals. After careful review, we affirm.

**I.**

In the light most favorable to Bell, the relevant facts are as follows. In October 2016, Bell was promoted to a supervisory position as an assistant nurse manager/staffing coordinator in the Tampa VA Hospital's spinal-cord-injury unit ("SCI"). Although assistant nurse managers were usually supervised by a nurse manager, Bell reported directly to Julia Lewis, the assistant chief nurse at SCI.

Bell knew when she was hired that "there were a lot of leadership and administrative leadership duties that [Assistant Chief Nurse Lewis] needed [Bell] to assist her with." Among those duties, Bell made staffing assignments for the SCI "Resource Pool," a group of nursing staff members who "float[ed]" to the ten subunits

and six clinics within SCI.  The Resource Pool had nine to fifteen members during the period relevant to this case.

Within a month of Bell's start in her position, SCI's interim chief nurse, Kathy Michel, announced that Bell would take over "direct supervision" of the Resource Pool.  That was a "shock" to Bell because "that's not what [she] was hired to do."  Lewis had told her she would not be directly supervising staff, and according to Bell, no other assistant nurse managers at the Tampa VA were a "directly supervising[,] first line supervisor of any staff."  Nor had an assistant nurse manager been responsible for the Resource Pool before Bell; prior supervisors had all been at least nurse managers. Lewis agreed that Bell's position as originally conceived did not include these duties, but that the change "came out of [Lewis's] being overwhelmed after [multiple] management people left."

After the announcement, Bell asked Assistant Chief Nurse Lewis and interim Chief Nurse Michel if they were going to "change [her] position to a nurse manager's position and give [her] the pay for directly supervising staff."  Lewis and Michel assured Bell that a promotion and pay raise were in the works and just needed to be processed by Laureen Doloresco, the chief nurse executive at the Tampa VA Hospital.  Later, Lewis and Michel told Bell that Doloresco was waiting for a new chief nurse to be hired at SCI.[1]  After Mary Alice Rippman was hired as SCI's permanent chief nurse, though, "it never happened."

---

[1] Assistant Chief Nurse Lewis denied promising to convert Bell to a nurse-manager position or discussing that matter with Nurse Executive Doloresco,

In December 2016, Bell began experiencing disrespectful, demeaning, and hostile behavior from one of the nurse managers at SCI.  Bell contacted the equal employment opportunity ("EEO") office in April 2017 based on the nurse manager's behavior, and she later submitted a formal complaint.  Bell also documented instances of the complained-of behavior to SCI management in emails in February, April, June, and August of 2017.  In particular, Bell copied Nurse Executive Doloresco on the June 2017 email, which referenced her prior EEO complaint.  The problematic nurse manager eventually was moved to a position elsewhere in the Tampa VA.

Meanwhile, in June 2017, Chief Nurse Rippman reassigned Bell to work night shifts several times a week, from 3:30 p.m. to midnight.  According to Rippman, this reassignment was part of an attempt to have a supervisor present during the night shift.  While working the night shift, when Chief Nurse Rippman and Assistant Chief Nurse Lewis were not present, Bell was "in charge of the entire building."  Other assistant nurse managers were also required to work the evening shift.  The job posting for Bell's position listed the work schedule as 3:30 p.m. to midnight.

---

and she testified that the VA "hiring system require[d] that it be a competitive position."  We credit Bell's version of her conversations with Lewis for purposes of this appeal.  *See Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1350–51 (11th Cir. 2022) ("[W]hen conflicts arise between the facts evidenced by the parties, we must credit [the non-movant's] version.").  Still, Doloresco's testimony that she was not aware of any proposal or request to convert Bell to a nurse-manager position stands unrebutted.

At other times, Bell objected to Chief Nurse Rippman's treatment of SCI nursing staff. Bell described two instances where Rippman ordered her to assign Black nurses on "light duty" status to janitorial work, such as removing gum from underneath bedside tables or cleaning the staff refrigerator, while a white nurse was assigned to answer phones.

Despite problems with a nurse manager, and occasional disputes with Chief Nurse Rippman, Bell excelled in her position. Bell received an "outstanding" rating in her performance review for the period from October 2016 to September 2017. The performance review noted that Bell joined SCI "amid sweeping leadership changes." The review continued in glowing terms:

> [W]ith almost no assistance, she shouldered full responsibility for the SCI Resource Pool to include hiring, coaching / mentoring, educating and even disciplining staff when needed. Further, when needed, she transitioned to work evening shifts routinely to provide a stabilizing leadership presence in-house during that work time. Due to her efforts, many staff members have commented that the work environment on that shift has greatly improved.

Although she excelled at her job, Bell increasingly felt that SCI management was taking advantage of her, discriminating against her based on race, and retaliating against her for filing EEO complaints. Hoping to escape what she viewed as a hostile environment, Bell applied for a staff position at another Tampa VA

Hospital unit, the home-based primary care unit ("HBPC"), in January 2018.

Bell was not one of the candidates selected by the interviewing panel for the HBPC position, and the interviewers designated no alternates. After one of the selected candidates dropped out, though, Tammie Terrell, a Black woman and the nurse manager of HBPC, offered Bell the position, and Bell accepted. Dr. June Leland, the medical director of HBPC and a member of the interviewing panel, objected that the interviewers should have been permitted to make the decision, but Human Resources determined that the selection was within Terrell's power and that Bell was validly hired.

Meanwhile, Bell continued to work at SCI in her assistant-nurse-manager/staffing-coordinator role. In early March 2018, Bell learned that she would be reassigned to an SCI subunit, SCI-D, under the supervision of Lynette Carballo, a nurse manager. The plan was for Bell to retain her role leading the Resource Pool, with Carballo acting as the "second line supervisor." Chief Nurse Rippman testified that the change was intended to standardize the reporting structure for assistant nurse managers and to give Bell experience running a discrete SCI unit, which would help her on the path to becoming a nurse manager.

But Bell viewed the transfer as part of a pattern of race discrimination and retaliation, as well as an attempt to undermine her claim for nurse-manager pay. Bell met with Nurse Executive Doloresco and asked to be removed from the SCI unit, stating that

she was being "retaliated against for filing an EEO complaint and not following" Chief Nurse Rippman's direction with respect to an employee investigation. Bell filed a formal EEOC complaint in March 2018.

The next month, Bell left SCI and started as a registered nurse at HBPC. The usual practice at HBPC was to assign nurses to patients near where they lived, to cut down on travel time. But according to Bell, she was assigned patients further from her than was ordinary, in both Lakeland and South Hillsborough Counties, and additional clinics. Terrell made the staffing decisions in collaboration with Dr. Leland. Bell was reassigned multiple times when white nurses living closer to her patients joined HBPC. Dr. Leland participated in the reassignment and said it was to balance patient caseloads.

Bell was "stressed to the max" working for HBPC. Her husband had multiple surgeries planned for 2019, and Bell herself developed stress-related medical issues for which she had surgery in January 2019 and June 2019. Plus, Bell planned to pursue further education to become a nurse practitioner.

In January 2019, Bell requested a move to part time, effective August 2019. She also reached out to another department to transfer to a part-time position. Raina Rochon, HBPC's chief nurse, denied Bell's request, stating that no part-time positions were available at HBPC or would be created. And the transfer never went forward.

In June 2019, in lieu of seeking a part-time position, Bell requested a leave of absence, or leave without pay ("LWOP"), from August 2019 to August 2020. She discussed her reasons for this request, including her and her husband's medical needs, in detail with Chief Nurse Rochon. In a memorandum to Human Resources, Rochon recommended the denial of Bell's request for LWOP because of its effect on patient caseloads. Other Tampa VA management, including Nurse Executive Doloresco and Hospital Director Joe Battle, signed off on Rochon's recommendation, and Bell's request was denied on July 31, 2019.

Bell learned of the denial of her LWOP request shortly after returning from a one-month period of Family and Medical Leave Act ("FMLA") leave. When she returned to work, her patients had been assigned to other nurses. She spoke with another employee who had been informed Bell was not coming back.

Bell again initiated contact with the EEO office, and she agreed to mediate her request for LWOP. At a mediation held in November 2019, Hospital Director Battle told Bell he would approve her LWOP request if she dropped all of her EEO complaints against the Agency. Bell told him, "Absolutely not."

Bell was absent from work from August 2019 to June 2020. After exhausting her FMLA leave, she was marked as absent without official leave ("AWOL"), and she received multiple letters ordering her to return to work and advising her that her continued absence would result in termination. Ultimately, though, Bell was

not terminated, suspended, or officially reprimanded when she returned to work in June 2020.

## II.

This Court reviews the grant of summary judgment de novo. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Summary judgment should be granted only if there is no genuine dispute of material fact, viewing evidence in the light most favorable to the non-movant. *Id.* There is a genuine issue if a reasonable jury could return a verdict for the non-movant. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997). But "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

## III.

Title VII provides that "[a]ll personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on race." 42 U.S.C. § 2000e-16(a). We have held that § 2000e-16(a) imposes different requirements for discrimination claims by federal employees than in other Title VII cases, explaining that federal personnel actions must not be tainted by differential treatment based on a protected characteristic. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198–1200, 1204 (11th Cir. 2021) ("*Babb II*"). If "'discrimination plays any part in the way a decision is made,' then that decision necessarily 'is not made in a way that is untainted by such discrimination.'" *Id.* at 1199 (quoting *Babb v. Wilkie*, 140 S. Ct. 1168, 1174 (2020) ("*Babb I*")).

Therefore, to succeed on a discrimination claim under § 2000e-16(a), a federal employee must show that the protected characteristic was the but-for cause of differential treatment, but it need not be the but-for cause of the ultimate decision. *See Buckley v. Sec'y of Army*, No. 21-12332, 2024 WL 1326503, at *7 (11th Cir. Mar. 28, 2024). Rather, the discrimination must merely play a role in that decision. *Id.* Even when there are non-discriminatory reasons for an adverse employment decision, those reasons do not "cancel out the presence, and the taint, of discriminatory considerations." *Babb II*, 992 F.3d at 1204.

But "even if [Bell] proves that race discrimination tainted the decision-making process, she is not necessarily entitled to all remedies under § 2000e-16(a)." *Buckley*, 2024 WL 1326503, at *7. If Bell proves that race discrimination was a but-for cause of the employment decision, she may be entitled to relief from damages caused by the employment decision, like compensatory damages and back pay. *See id.* at *8. On the other hand, if Bell proves only that discrimination "tainted" the decision-making process but that the VA would have reached the same employment decision even if no discrimination tainted the process, she cannot recover relief from damages caused by the employment decision. *Id.* Rather, we "begin by considering injunctive or other forward-looking relief." *Id.* (quoting *Babb II*, 992 F.3d at 1205 n.8).

As for Bell's burden, she may establish discriminatory intent through circumstantial evidence, including discriminatory comments, suspicious timing, arbitrariness in the employer's actions,

pretext in the employer's rationale, better treatment of similarly situated, non-Black employees outside the protected group, and similar experiences by Black employees. *See Lewis v. City of Union City. (Lewis II)*, 934 F.3d 1169, 1185–86 (11th Cir. 2019); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328, 1341–46 (11th Cir. 2011).

## A.

Initially, Bell has abandoned certain issues by failing to adequately raise them on appeal. Ordinarily, issues not "plainly and prominently" raised on appeal are deemed abandoned and we will consider them. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). The failure to properly raise an issue for appeal results in "forfeiture of the issue," subject to *sua sponte* review by this Court only in "extraordinary circumstances." *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc).

In her briefing on appeal, Bell argues that a jury could infer differential treatment based on race from her evidence of unequal pay. But aside from a lone, passing reference to "denied appointments, promotions . . . , reassignment . . . and denial of" LWOP, she has not developed any argument that race played a role in the other employment decisions she raised before the district court. She also does not challenge the district court's ruling that her claims of race discrimination arising from her time at HBPC were unexhausted.

Accordingly, other than with respect to her allegedly unequal pay, Bell has forfeited any argument that employment

decisions at SCI—such as her night-shift duties and forced reassignment to a subordinate position under a nurse manager—were tainted by race.   She has likewise forfeited any argument that she properly exhausted a claim of race discrimination based on events at HBPC.  *See Sapuppo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").  And Bell has not shown that "extraordinary circumstances" excuse her failure to raise these claims. *Campbell*, 26 F.4th at 873.  So we do not consider them here.

## B.

Next, no reasonable jury could find, based on this record, that the decision to pay Bell only as an assistant nurse manager was tainted by differential treatment based on race.  *See Babb II*, 992 F.3d at 1199–1200, 1204; *Buckley*, 2024 WL 1326503, at *7.

In the light most favorable to Bell, the record shows that, shortly after Bell joined SCI as an assistant nurse manager/staffing coordinator, she was given new duties as the direct supervisor of a group of nurses known the Resource Pool, a job ordinarily performed by a nurse manager or higher-level position.  Bell's supervisors at the time, interim Chief Nurse Michel and Assistant Chief Nurse Lewis, promised her a promotion and raise to compensate for these new duties.  But no paperwork was ever submitted to effectuate the change. Instead, in March 2018, after a new chief nurse came on board, SCI made the decision to reassign Bell to an SCI

subunit, SCI-D, under Nurse Manager Caballo, while retaining her first-line supervisory duties over the Resource Pool.

Even assuming Bell was not fairly paid for the additional responsibilities she shouldered, the record contains no evidence to connect Bell's salary with her race. Bell relies on the fact that she was the only Black manager at SCI at the time of the events. But she has not identified any other assistant nurse managers, outside her protected class, who were paid extra for undertaking additional supervisory responsibilities.[2] And there was evidence that other assistant nurse managers supervised staff when nurse managers were not present, just as Bell did. In addition, no meaningful comparison can be made between Bell and nurse managers at SCI, since they were subject to different hiring criteria, had different job titles, and were responsible for managing discrete clinical units within SCI. Thus, Bell has not identified any evidence of other employees from which to draw an inference of differential treatment based on race.

Not only that, but the evidence is otherwise undisputed that Bell joined SCI during a period of leadership turnover. Multiple members of management, including the chief nurse, had left just before Bell was hired, and Bell's position was intended to help fill that leadership gap by reporting directly to the assistant chief nurse instead of a nurse manager, like other assistant managers. Her role

---

[2] The VA handbook's prescriptive pay increase for nurses in supervisory positions does not yield an actual comparator, as Bell did not identify any occasion on which someone's pay was increased in accordance with the provision.

was "somewhat unique" in that respect.  That Chief Nurse Rippman later decided to restructure Bell's position, standardizing the reporting structure, does not, without more, suggest any discriminatory animus.  And Bell does not identify any other suspicious timing, ambiguous statements, arbitrariness, or pretext that could suggest that racial discrimination played a role in SCI's failure to promote Bell or to give her a raise.  *See Lewis II*, 934 F.3d at 1185–86.

Instead, Bell cites her own testimony that Chief Nurse Rippman twice assigned Black nurses on light duty to housekeeping duties, while a white nurse was told to answer phones.[3]  Bell also introduced statements by other employees who felt they had been subject to racial discrimination at the Tampa VA.

Evidence that coworkers in the plaintiff's protected group were discriminated against may be probative of discriminatory intent.  *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008).  In *Goldsmith*, for example, we upheld the admission of "me too" testimony from coworkers who were subjected to the "same supervisor[s]" and the same basic employment decision—termination.  *See id.*  We reasoned that this evidence was probative of the common decisionmaker's "intent to discriminate," and of the alleged racially hostile work environment.  *Id.*

---

[3] Bell also points to alleged sexual comments Chief Nurse Rippman made to others.  But whatever else may be said about these sexual comments, we fail to see how they are probative of race discrimination.

In contrast to the evidence in *Goldsmith*, though, Bell's evidence is not similar enough to support an inference that Bell was subjected to differential treatment based on race. The other employees who felt they had been subjected to racial discrimination at the Tampa VA were employed in different units and had different supervisors, so no inference can be drawn about the decisionmakers in Bell's case: interim Chief Nurse Michel, Chief Nurse Rippman, and Assistant Chief Nurse Lewis.[4] *See id.* While Bell's testimony about discriminatory light-duty assignments involved Rippman, these incidents involved substantially different circumstances and employment decisions than are at issue here. *See id.*; *cf. Smith*, 644 F.3d at 1344 (indicating that "evidence of behavior toward or comments directed at other employees in the same protected group" must be "closely related to the plaintiff's circumstances" to show discriminatory intent). Accordingly, we cannot say that this evidence supports a finding that the pay and promotion decisions were tainted by "discrimination based on race." 42 U.S.C. § 2000e-16(a); *see Anderson*, 477 U.S. at 249–50.

For these reasons, Bell has not created a genuine issue of material fact as to whether SCI's decision to pay her only as an assistant nurse manager was tainted by differential treatment based on

---

[4] Bell suggests that Nurse Executive Doloresco is the common thread that connects her experience to the experiences of these other employees. But Doloresco provided unrebutted testimony that she was not aware of any request to convert Bell's position to nurse manager or to offer her more pay.

race.  *See Babb II*, 992 F.3d at 1199–1200, 1204; *Buckley*, 2024 WL 1326503, at \*7.

## IV.

Title VII also protects federal employees from retaliation for filing charges of discrimination.  *Babb II*, 992 F.3d at 1203 ("[D]is-crimination, as used in Title VII's federal-sector provision, by its own terms includes retaliation." (quotation marks omitted)).  A plaintiff bringing a retaliation claim, whether based on discrete acts or a retaliatory hostile work environment, must show that "the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862–63 (11th Cir. 2020)).  She must also satisfy the "more lenient causation standard" as outlined in *Babb I*—that is, that the conduct complained of was tainted by differential treatment based on her protected activity.  *Id.* at 835.

Here, the evidence, construed in Bell's favor, does not support a reasonable inference that retaliation played a part in the actions of which Bell complains.  As the district court explained, SCI's failure to change Bell's position to that of a nurse manager or offer her higher pay began well before Bell initiated her first EEO complaint in April 2017, so these failures cannot reasonably be considered causally related to that protected activity.  *See, e.g.*, *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (holding that if alleged retaliatory conduct occurred before

22-12698                Opinion of the Court                17

the employee engaged in protected activity, the two events cannot be causally connected).

Likewise, the decision to realign Bell's position in early 2018—effectively ending any chance of a promotion or additional pay—was made before she initiated her second EEO complaint. And these events occurred nearly one year after SCI management became aware of the first EEO complaint about an allegedly hostile work environment created by another nurse manager, and approximately six months after Bell's last email to management about those same issues in August 2017. That time lag is too long to suggest causation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that a three- to four-month delay between the EEO action and the adverse action does not suggest causation).

Bell contends that the retaliation continued once she transferred to HBPC, but she has offered no evidence to show that the decision makers at HBPC were "aware of the protected conduct" at the time of their challenged actions.[5]  *See Brungart v. BellSouth*

---

[5] Bell faults the district court for failing to consider her testimony that SCI Chief Nurse Rippman, SCI Assistant Chief Nurse Lewis, and HBPC Chief Nurse Roshon told HBPC Nurse Manager Carballo to retract her reference for Bell and "make it bad" in connection with her transfer to HBPC. Bell never raised this matter at summary judgment, though, so the court was not required to consider it. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

*Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action."). There is no evidence that Dr. Leland—who objected to Bell's placement in the program and then later gave Bell less desirable assignments—had any knowledge of Bell's earlier EEO activity. There is similarly no evidence that Chief Nurse Rochon—who denied Bell's request for a part-time position or LWOP—was aware of Bell's prior EEO activity at the time of her decision. Because "[a] decision maker cannot have been motivated to retaliate by something unknown to [her]," *Brungart*, 231 F.3d at 799, Bell has not shown that the decisionmakers at HBPC were motivated even in part by retaliation for her protected activity.

Bell speculates that Nurse Executive Doloresco probably told Dr. Leland about this activity, or that Doloresco otherwise had a hand in these decisions apart from simply signing off on Rochon's denial of LWOP, but such speculation is insufficient to defeat summary judgment.[6] *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (stating that "[s]peculation does not create a genuine issue of fact" for purposes of summary judgment). No reasonable jury could conclude from the scattered bits and pieces of

---

[6] Accordingly, Bell's evidence about Nurse Executive Doloresco's alleged history of "EEO hostility" and "EEO retaliatory animus" is also insufficient to establish a genuine issue of material fact in this case.

22-12698                  Opinion of the Court                  19

evidence Bell has assembled that Doloresco was wielding influence behind the scenes to blacklist Bell.

Bell also cites her change to the night shift and the warning letters she received for failing to report to work after her request for LWOP was denied.  But the evidence does not show that these actions were causally related to her protected activity or that they would dissuade a reasonable worker from reporting discrimination.  *See Tonkyro*, 995 F.3d at 836.  The evening shift was advertised in the job posting for Bell's position, and other assistant managers were also required to work that shift.  And it is undisputed that Bell was absent without authorized leave when she received the warning letters and that she was never disciplined for that period of absence from work.

For these reasons, we cannot say the evidence, even viewed in the light most favorable to Bell, would support a reasonable verdict in Bell's favor on her retaliation claims, whether based on a discrete employment action or hostile work environment.[7]

## V.

In sum, we affirm the grant of summary judgment to the Secretary on Bell's Title VII claims of race discrimination and retaliation.

**AFFIRMED.**

---

[7] Bell has not raised on appeal, and so has abandoned, any argument that Hospital Director Battle's offer to settle her EEO complaints in exchange for granting her request for LWOP was retaliatory.  *See Sapuppo*, 739 F.3d at 680.